Laramoee, Judge,
delivered the opinion of the court:
Plaintiff served on active duty as a Reserve officer in the Navy from 1941 to 1946. He was released from active duty, not by reason of physical disability, on January 11,1946. In this action he seeks disability retired pay from the date of his release from active duty. In his petition, plaintiff merely alleges that he is entitled to this retired pay. However, he *147 did apply to the Board for Correction of Naval Records, requesting that his records be corrected to show that he was entitled to retired pay from the date of his release from active duty. Testimony was taken before the commissioner of this court concerning the question of arbitrariness and/or illegality of the Correction Board’s decision which was adverse to plaintiff. Plaintiff’s brief is premised on the fact that the Correction Board erred. Defendant on brief has answered plaintiff’s contention and maintains that the Correction Board’s decision was correct. Consequently, in this opinion, we will treat the claim as one based on an alleged erroneous decision of the Correction Board.
Plaintiff’s first contention in his brief is that at the time he was discharged he should have been sent before a retiring board. Nothing in the petition suggests any arbitrary action in this connection, and plaintiff cites no authority for this claim. Moreover, the first time this contention appears is in plaintiff’s brief wherein he states that at the time he was physically examined for release he reported his history of myoclonic seizures, etc., and was advised by the Naval Medical Officer to submit his claim to the Veterans Administration. He did not identify the officer, and defendant was given no opportunity to refute the statement. Under these circumstances, probably the testimony should not have been received. Boraiko v. United States, 146 Ct. Cl. 814, 817 (1959). This contention raises issues of fact to which the defendant has not had an opportunity to address itself. Under the circumstances, plaintiff’s belated attempt to raise this issue should not be allowed. However, in any event, plaintiff cannot predicate his cause of action on alleged arbitrary action by defendant occurring 13 years before his petition was filed, since such a cause of action would be barred by our 6-year statute of limitations. 28 U.S.C. § 2501 (1958 Ed.).
Furthermore, in a letter written to the Veterans Administration on October 27, 1946, plaintiff described his conversation with the Navy doctor, as follows:
In October of 1945 I was given my discharge examination at which time I asked the doctor for advice and treatment. I was told that nothing was evident in the' examination and to file a physical disability . claim *148 through the Red Cross office in the Discharge center, which I did.
Plaintiff made no application to appear before a retiring board, and under the circumstances above outlined we find no substance in this claim. Moreover, plaintiff was subsequently given a hearing — the one before the Correction Board, which he now attacks.
The Correction Board, after reviewing and considering plaintiff’s Veterans Administration and Navy medical records, the documents submitted by plaintiff, and the advisory opinions of the Disability Review Board and the Bureau of Medicine and Surgery, denied plaintiff’s application. This court has held that unless plaintiff shows “by cogent and clearly convincing evidence” that such determinations are arbitrary, capricious, or not supported by substantial evidence, it will not upset the determination of the military departments. See John A. Furlong v. United States, 153 Ct. Cl. 557, 563.
Thus, the question we are here confronted with is whether in fact there was substantial evidence to support the Correction Board’s findings.
In this case there is a dispute as to whether plaintiff’s muscular tics are caused by a phychoneurotic condition or by an epileptic condition. Several private doctors who had examined plaintiff since his release from active duty in 1946 have expressed the opinion that plaintiff is suffering from “petit mal epilepsy.” The Veterans Administration which has been examining plaintiff continuously since his release, at first diagnosed his condition as “psychoneuroses — hysterical type — mild, manifested by muscular spasms.” Later, the Veterans Administration’s doctor concluded that plaintiff was suffering from “epilepsy, grand mal.” Still later, the Veterans Administration, after an examination by another Veterans Administration doctor in 1950, diagnosed plaintiff’s condition as conversion reaction rather than epilepsy.[1]
*149 Since the above-mentioned examination in 1950, plaintiff has undergone various neuropsychiatric examinations, and the result reached has always been in accord with the 1950 diagnosis. The Veterans Administration has continued to follow that diagnosis.
Dr. Stevens, a neuropsychiatrist, who first examined plaintiff in 1959, more than 13 years after his release from active duty, diagnosed that plaintiff was suffering from “reading myoclonic epilepsy,” which is the type of seizure precipitated principally by reading, although the neurological examination which he gave plaintiff was negative and the electroencephalogram which he performed was also negative. At trial, he testified that the onset of this condition was in 1943 and disqualified plaintiff for active duty in 1946. However, he also testified that he did not know the criteria used by the Navy in 1946 in determining whether an officer was incapacitated for active duty.
The other doctor who testified for plaintiff, Dr. Stephenson, and who had never examined plaintiff, stated that from his examination of the records the weight of the evidence supported a diagnosis of epilepsy and that plaintiff should have been retired for physical disability. However, Dr. Stephenson testified he was not a neurologist and had never treated an epileptic. Moreover, he admitted that the Navy standards for 1945 and 1946 did not provide that a man with epilepsy would be incapacitated for active duty.
Opposed to this, Dr. Gilíes, a lieutenant in the Navy Medical Corps, who was the head of the Department of Neurology at the National Naval Medical Center, testified that the Veterans Administration’s diagnosis of plaintiff’s condition as “conversion reaction” was correct. He also testified that whether or not plaintiff’s condition at the time of release was epilepsy or conversion reaction, the condition did not incapacitate him for active duty at the time. This conclusion is bolstered by the fact that during the years 1945 and 1946 the criterion used by the Navy to determine whether an officer was incapacitated for active duty was whether his physical condition was such that it did not permit his performance of the duties of his office in a reasonable manner. No disease or injury was considered incapacitating per se, *150 and the fact that an individual was suffering from epilepsy, whether grand mal or petit mal, or from conversion reaction, was not in and of itself a sufficient basis to declare that the individual was incapacitated for active duty. In applying the criterion to an individual case, a number of factors were considered, including the nature of the disease or injury, its manifestations in the individual, and in what way it might impair the individual’s performance of the duties which persons of the same grade and type of duties would be expected to perform.
Additionally, Dr. Gilíes’ diagnosis is buttressed by all the physical examinations and negative electroencephalograms given plaintiff while in the service which negated any claim of epilepsy or incapacity for active duty. As a matter of fact, the evidence shows that all plaintiff ever suffered from, other than a cold, was an occasional “tic”.
Treating the evidence as a whole, we cannot say who was right or wrong. He was examined at least 13 times while in service and found physically fit. His medical records were examined by Dr. Gilíes who found that plaintiff was neither suffering from epilepsy, nor was incapacitated for active duty at the time of his release.
Since all this evidence was before the Correction Board, we think there was substantial evidence to support the findings of the Board. In other words, plaintiff has failed in his burden to show that the Correction Board’s decision was unsupported by substantial evidence.
Plaintiff additionally contends that he was denied an oral hearing before the Correction Board in connection with its action upon his application.
We are not certain wherein plaintiff thinks this action was improper. We assume that plaintiff desired to have his attorney present for oral argument. However, the Navy regulations establishing the Correction Board provide in part:
§ 723.3 Application for correction.
(e) Review of application.
Each application and the available military or naval records pertinent to the corrective action requested will be reviewed to determine whether to authorize a hearing *151 or to deny the application without a hearing. The Board will make this determination in all cases except those in which the application has been denied administratively for the reason that the applicant has not exhausted all other effective administrative remedies available to him. [32 C.F.R. § 723.3 (1954 edition with 1961 Cumulative Pocket Supplement) ].
Thus, it can be seen that the Board is empowered to deny an application without a hearing. (Plaintiff in this case did get a hearing and did present evidence before the Correction Board.) The only question then is whether the action taken was arbitrary, etc. This court, in Wales v. United States, 132 Ct. Cl. 765, 770, stated that “[t]he statute creating this Board [65 Stat. 655] does not require that a hearing be given.” Furthermore, plaintiff’s attorney (who is his present counsel) advised the President of the Navy Physical Disability Keview Board, prior to the Correction Board’s action, that although he had requested an oral hearing before the Board for Correction of Naval Records, he had no evidence to submit in addition to that which had appeared in the record and in the briefs submitted by him. This fact was relayed to the Chairman of the Correction Board. Under these circumstances, we see no arbitrary action in denying an oral hearing.
In support of plaintiff’s contention above, he cites Bailey v. Richardson, 341 U.S. 918; Greene v. McElroy, 360 U.S. 474; Williams v. Zuckert, 371 U.S. 531. Each of the above cases was predicated upon a removal from Federal service. Plaintiff was not removed and no claim of such is made. The cases are inapposite.
In conclusion, we are of the opinion that there was substantial evidence to support the Correction Board’s finding that plaintiff was not incapacitated at the time of release from active duty.
Consequently, plaintiff is not entitled to recover and his petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
*152 1. Plaintiff, who was bom in Boston, Massachusetts, on July 1, 1918, is a resident of Maryland. On April 25, 1939, he was appointed a Merchant Marine Cadet, U.S. Naval Reserve, and entered the Merchant Marine as an officer (third mate). On December 26, 1940, he accepted appointment as Ensign, U.S. Naval Reserve, and entered on extended active duty as a reserve officer in this grade on January 6, 1941. After a series of promotions he was appointed temporary Lieutenant Commander, effective July 27, 1945. On October 22, 1945, plaintiff was detached from active duty and granted 2 months and 20 days terminal leave, on the expiration of which he was on January 11, 1946, released from active duty, not by reason of physical disability. He was transferred to the Honorary Retired List of the U.S. Naval Reserve with the rank of Lieutenant Commander without pay or allowances effective October 1,1952.
2. In this suit plaintiff seeks disability retirement pay from the date of his release from active duty on January 11, 1946. The amount of recovery, if any, is reserved under rule 38(c).
3. Plaintiff entered the Massachusetts Nautical School as a cadet in 1937. The school was conducted on a square-rigged sailing ship and plaintiff’s assignments included climbing aloft in all kinds of weather. Plaintiff did not have any apparent physical disability while on the school ship. He was graduated in 1939.
4. On December 26, 1940, prior to entering on extended active duty, plaintiff was given a physical examination by the U.S. Naval Reserve and found physically qualified for active duty, with no defects noted. The report of the examination reads in part as follows:
Nervous system Normal
(Organic or functional disorders)
Romberg negative Incoordination (gait, speech) none
Reflexes, superficial normal, deep (knee, ankle, elbow) normal Tremors none
Serological tests (when required) Not required
Abnormal psyche (neurasthenia, psychasthenia, depression, instability, worries) none
*153 5. (a) Plaintiff’s first assignment after he entered on active duty on January 6,1941, was on the U.S.S. Melville, a destroyer tender on which plaintiff served, until July 15, 1943, as watch and division officer. His duties included the standing of watches and navigation, and necessitated plaintiff climbing up and down ladders.
(b) On August 21, 1941, plaintiff was given an annual physical examination by the Navy and found physically qualified to perform the duties of his grade at sea. No disqualifying defects were noted and plaintiff’s nervous system was found to be normal.
(c) On January 7, 1942, plaintiff was examined by the Navy and found physically qualified and temperamentally adapted for duty involving the actual control of aircraft. No disqualifying defects were noted.
(d) On April 25, 1942, plaintiff was examined by the Navy and found physically qualified and aeronautically adapted for duty involving lighter-than-air training. No disqualifying defects were noted.
(e) On June 17,1942, plaintiff was examined by the Navy and fotmd physically qualified for temporary promotion to Lieutenant (J.G.), U.S. Naval Reserve. No defects were noted and plaintiff’s nervous system was found to be normal.
(f) On August 8, 1942, plaintiff was given a Navy physical examination for flying and found physically qualified and temperamentally adapted as a student aviator for duty involving heavier-than-air flight training. No disqualifying defects were noted.
(g) On December 1Y, 1942, plaintiff was examined by the Navy and found physically qualified for temporary appointment to Lieutenant, U.S. Naval Reserve. No disqualifying defects were noted and plaintiff’s nervous system was found to be normal.
(h) On February 10, 1943, plaintiff was examined by the Navy and found physically qualified for second-class diving.
6. (a) On October 12,1943, plaintiff began service as gunnery officer and navigator on the U.S.S. Luzon, a repair-type vessel.
(b) At the trial plaintiff testified that, while going up a ladder from the lower deck to the bridge of the U.S.S. *154 Luzon, be hit his head on a metal beam and was knocked down; but that he did not lose consciousness and in a few seconds he got up and went on to general quarters. Plaintiff further testified that the occurrence took place shortly prior to a visit which he made to the U.S.S. Luzon medical officer on December 9,1943. Plaintiff did not report the occurrence to the medical officer, nor is there any reference to the occurrence in any of plaintiff’s medical records.
(c) On December 9, 1943, the following entry was made in plaintiff’s Navy Medical History:
U.S.S. LUZON
At sea 12-9-43
Diag: CATARRHAL FEVER, ACUTE #801
Patient presented himself to Sick Bay with typical Catarrhal Fever symptoms. Under bed rest, force fluids, and A.P.C., recovery was uneventful. Discharged to duty 12-11-43
(Signature)
John K. Herman
Lieut. MC USNB
Catarrhal fever is a term sometimes used to describe an upper respiratory infection which is more commonly known as a cold or the flu.
(d) Beginning during the first 3 months of 1944 plaintiff experienced tics (twitching)[2] in his arms and hands about once a week. Plaintiff related at the trial, by way of illustration of the effect of the tics, an incident in which the tics caused him to drop a cup of coffee and another incident in which they caused him to drop a sextant from his hand to a chart table. A month or two after the tics appeared in plaintiff’s arms he experienced tics in his legs, but with less frequency than the tics in his arms. On occasions the tics in plaintiff’s legs caused a buckling of his knees and stumbling. Plaintiff also noticed that at times his jaw “seemed to jerk a little bit or tremble” and that he “could not speak clearly.” The tics lasted only a fraction of a second.
*155 (e) On July 6, 1944, plaintiff was given a Kahn (blood) test by the Navy, the results of which were negative.
(f) On August 24, 1944, plaintiff passed a night vision test given by the Navy.
(g) On October 30, 1944, plaintiff was given a physical examination by the Navy, with no defects noted.
7. (a) On November 25, 1944, plaintiff began service on the U.S.S. Tate which was then in the Pacific Theatre of Operations and on which plaintiff served through several engagements as navigator, executive officer, and for a short time as temporary commanding officer.
(b) On December 5, 1944, plaintiff was given an annual physical examination by the Navy, with no defects noted.
(c) On August 18, 1945, plaintiff was given an examination by the Navy aboard the U.S.S. Tate and found physically qualified for promotion in rank to Lieutenant Commander. No defects were noted and plaintiff’s nervous system was found to be normal. In the report of the examination, following the caption “History of illness or injury,” the following appears: “Tonsillectomy at five years.”
(d) On September 22,1945, the following entry was made in plaintiff’s Navy Medical History:
TJSS TATE (AKA — 7 0)
FLEET POST OEEIOE
SAN FRANCISCO, CALEF.
SEP 22 1945
Examined this date and found physically qualified for transfer.
Mr. Boland gave recent complaints of nervous tic consisting of involuntary muscular contraction of forearms on rare occasions, particularly when under considerable mental stress. Examination reveals no organic basis for above and it is considered functional.
(Signature)
E. C. HEINAN
LT. (MC) ETSNR
8. On October 22, 1945, plaintiff was given a physical examination at a separation center in Boston, Massachusetts, for release from active duty, and found physically qualified for release from active duty. In the report of the examina *156 tion following the caption “History of illness or injury,” the following appears: “No significant change. Denies all serious illness or injury while on active duty TTSNR. Except occasional tic of hand, Sept. 1945 when under strain.” The report further reads in part as follows:
Nervous system normal; no evidence of Tic or other C.N.S. condition
Romberg negative Incoordination (gait, speech) none
Reflexes, superficial normal, deep (knee, ankle, elbow) normal Tremors none
Serological tests (when required) Kahn negative
Abnormal psyche (neurasthenia, psychasthenia, depression, instability, worries) no history or present evidence of instability
* * * * *
Is the individual fit to perform active duty at sea or on foreign service? (If not, state limit of duty) xes
Plaintiff’s Navy Medical History for October 22, 1945, signed by a Navy Medical Officer, reads: “Examined this date and found physically qualified for release from active duty. Defects Noted: 1) Chronically inflamed left tonsil stump. No hosp. necessary.”
9. At the trial plaintiff testified that at the time of the physical examination for his release from active duty he reported his physical condition and symptoms (including tics and stumbling) to the examining doctor who commented, “You don’t want to go to the hospital for 6 months or more, do you?”; and that plaintiff replied, “No, I don’t believe so.” Plaintiff further testified that the doctor then said, “Well, if you have a complaint of this sort go down and file it with the Veterans Administration” which was located down the hall in the same building.
10. On October 22, 1945, the date on which plaintiff was given a physical examination for release from active duty, and the date on which plaintiff was detached from active duty and granted terminal leave, he filed with the Veterans Administration an application for compensation or pension. In the application following the caption, “Nature of disease or injury on account of which claim is made and date each *157 began,” plaintiff stated, “nervous twitch in both arras, apparently due to fatigue — 5/1943.” At the completion of the application, plaintiff certified as follows:
* * * 1[3] (have read) (have had read to me) all questions and answers thereto embodied in this application; that answers to all above questions are true and complete to the best of my knowledge and belief; that I have submitted all available information and evidence in support of this application, and that the foregoing statements are made as a part thereof with full knowledge of the penalty provided for making a false statement as to a material fact in such application.
11. During the course of plaintiff’s active duty the periodic Fitness Keports submitted on plaintiff by his commanding officers all were graded from satisfactory to excellent. These reports were issued about every 3 months from the time plaintiff entered on active duty until his release from active duty and constituted a rating of plaintiff’s performance of his duties. In response to a query in all of the reports plaintiff’s various commanding officers answered that plaintiff did not have any weaknesses — mental, moral, or physical — which adversely affected his efficiency. The Fitness Keport on plaintiff covering the period beginning September 1, 1945, rated plaintiff within the top 10 percent on every item composing the factors on which plaintiff was rated, including performance of present duties, reactions during emergencies, military conduct, ability to command, and performance at battle station or in battle duties.
12. Shortly after his release from active duty on January 11, 1946, plaintiff consulted his family doctor concerning his condition and was advised by his family doctor not to go back to sea in the Merchant Marine where plaintiff had been employed prior to entering the Navy. On February 15, 1946, plaintiff went to work for a brokerage firm in Boston in a training status. He worked for this firm until November 1947 when he voluntarily left because of better opportunity at other employment. Concerning the employment at the brokerage firm, plaintiff stated, “I tried to do the work as best I could and again and again I ran into a great amount *158 of interference from my mind on tbe jerks and also some cases from stumbling and I found it even at times affected my speech and I stammered or stuttered a little bit.”
13. On April 25, 1946, the Veterans Administration made a request for Navy information on plaintiff, in which request the following appears:
Nervous twitch in both arms, 5/43. Consulted Ship Doctor, U.S.S. Tate (OKA 70). 5/43. Please verify dates of service, character of discharge, and furnish physical exam at enlistment.
14. On July 30,1946, plaintiff was given a physical examination by the Veterans Administration.
In the report of the examination under the caption “Origin and date of incurrence of disability,” the following appears:
Winter of 1944 — observed sudden jerking of first one forearm and hand — and then the other. Followed in about one year by spasmodic jerking of entire body. Was navigator of TJ.S.S. Luzon in Pacific at this time.
Under the caption, “Brief medical and industrial history,” the following appears:
Has had no medical care since discharge from service.
Work History:
(a) Kidder Peabody Co. — Boston—Feb. 1, 1946 to the present — assistant to institutional bond trader — 40 hrs wk — $41/wk.
Under the caption, “Present complaint (subjective symptoms, not diagnosis) ” the following appears:
“I have still an occasional jerking” of the upper and lower extremities. “It does bother me in my business— several times a day. Some days it may not ¿other at all. It bothers me when I’m at home. This morning when I was shaving my hands jerked sufficient to drop my razor. This recurred several times. Because of this spasmodic jerking I would be afraid to go back to sea— or go aloft. I feel very uncertain when I have to climb or go aloft which a year ago would be nothing. I’d be afraid of myself of jerking and letting go.”
The examination of plaintiff included a neurological examination, the results of which were normal. In the report *159 of the examination, under the caption “Additional,” the following appears:
Chief Complaint (contd) Denies anxiety, worry or fear. No insomnia. “At other times I noticed the jerking when I sit down to type. I’ve had an awful time with the addressograph. When I try to sit down and type even at home I get it (i.e. jerking). ”
Mental Exam:
General Behavior: relaxed — cooperative—alert—neatly dressed- — no spasmodic movements observed over a 75 minute period.
Mood: appropriate — “I’m very happy and getting along pretty well except for this thing (i.e. jerkings) that comes up — It hinders me in my business It repeatedly comes up in my mind — sometimes it is more severe than others.”
Stream of talk: coherent, relevant, spontaneous, productive — sticks to goal.
Memory: intact
Grasp of Information: adequate
Misinterpretations, ideas of reference, delusions, illusions, and hallucinations — not present
Judgment: Fair
Insight:
The Diagnosis was “Psychoneurosis — hysterical type— mild, manifested by muscle spasms.” The report further noted that no hospitalization of plaintiff was needed.
15. On September 6, 1946, plaintiff was rated by the Veterans Administration as follows:
mm. Disability Neevous twitch, both aems not found on last examination.
Bated, 1945S-Class 9
16. A letter, dated October 27, 1946, from plaintiff addressed to the Adjudication Officer, Veterans Administration, Boston, Massachusetts, reads as follows:
Dear Sir,
The following is a brief summary of the disability I have.
About April or May of 1944 while I was serving as Gunnery Office and later as Navigator on the TT.S.S. *160 Luzon, A.B.G.-2 in the Pacific, I began to have occasional spells of dropping things. This usually resulted from a sudden contraction of my arms, entirely involuntary. It was similar to the slight jump one sometimes has when sleeping. I first noticed it while on Pilot duty in Kwajalein Atol. It did not disturb me a great deal at first because I thought it was simply a result of being over tired. However the spells became more frequent and more intense involving contraction of my legs and very short fainting spells. However I did not report it to the ship’s doctor; why, I don’t know, except that I held a position of considerable responsibility and didn’t want anyone to know anything was wrong with me even though it hindered my ability somewhat.
I was detached from the TJ.S.S. Luzon and assigned Executive Officer of the TJ.S.S. Tate, AKA-70, in which I served for one year and was in invasions in the Philippines and Okinawa.
My condition continued and although I covered it up as much as I could it was embarrassing and continued to handicap my working.
Several times I fell down in my room as a result of it. On one occasion I fell a short distance down the bridge ladder to the deck because of a spasm.
In August 1945 I talked with the Ship’s doctor about this and he seemed to feel it was a case of overwork and being tired and that a change would relieve it. At this time I asked him if he would make a notation of it in my medical record which was done.
In October of 1945 I was given my discharge examination at which time I asked the doctor for advice and treatment. I was told that nothing was evident in the examination and to file a physical disability claim through the Bed Cross office in the Discharge center, which I did.
My condition had become so serious that I did not dare to climb ladders or get into any other position on board ship or anywhere else where I would injure myself and therefore instead of returning to the Merchant Marine I went to work as an investment clerk. However in this work also I found considerable difficulty. My arms would jerk and I had an extremely hard time writing figures & keeping books.
Not only did these spasms interfere with my work but also in my home life. It bothered me in everything from shaving to caring for the baby. In fact I did not dare to Íick up our baby for fear of a spasm and dropping him. have spilled boiling water on myself, dropped dishes, *161 cut my hand with an axe and numerous other accidents resulting from these spasms.
I have applied to the Veterans Administration for treatment several times and was admitted to the Mental Hygiene Clinic for treatment and later released from there.
I also went to a friend, Dr. Rodney Shippen, Bellevue Ave., Melrose, who gave me a neurological examination and a prescription. However as in other examinations he didn’t see me actually have an attack.
This service connected disability has caused me considerable worry and difficulty in business, financially, and in my family life. I feel the Veterans Administration should immediately give me the assistance I need.
Very truly yours
s/ Kells M. Boland
Subscribed and sworn to before me this 28th day of October, 1947
s/ James R. Lowell
Notary Public
My commission expires Dec. 18,1947.
17. The foregoing letter was accompanied by an affidavit of plaintiff’s mother and an affidavit of plaintiff’s wife, both dated October 27, 1946, respecting plaintiff’s condition.
18. On November 29, 1946, plaintiff made an office visit to Dr. K. L. Maclachlan, Melrose, Massachusetts, who in a letter dated October 24,1947, to the Veterans Administration, wrote in pertinent part as follows:
Mr. Boland was next seen in my office on November 29, 1946 with an acute case of nerves developed during the war while on duty as a navigator. He had a tendency to drop things and even fainted at times. He stated that he was discharged from the service in October 1945 with a notation of a nervous condition on his medical record. He further stated that since discharge his spells of dropping things still persisted causing him to drop boiling water on his feet and sometimes he was unable to control his hands while writing, making a line across the sheet instead of words.
Physical Examination: Blood Pressure 128/70 Neurological: negative. Cardiovascular: negative. First degree bums were found on both thighs, lower legs, and left instep. Impression: Petit-mal. Treatment : Dilantin sodium twice a day.
I have not seen this man since this office visit and do not know how he progressed.
*162 19. On December 3, 1946, plaintiff was referred to tbe Mental Hygiene Unit of tlie Veterans Administration where he was seen a total of 15 times and discharged as improved on April 8, 1947. The diagnosis was “Psychoneurosis, conversion type, manifested by tics which consist of jerking of the extremities.” The report of the Mental Hygiene Unit on plaintiff contains the following:
4. pRedispositioN : — Mild compulsive character.
5. militart stress. — Mild, to moderate.
6. impairment of function : — Mild.
20. In November 1947 plaintiff voluntarily left the brokerage firm where he had been employed since February 15, 1946, and went to work for a cordage company in Plymouth, Massachusetts, which, as noted in finding 12, supra, offered greater opportunity. Plaintiff’s new work was as a time and motion study engineer. Concerning this employment plaintiff stated that he had a “very difficult time with the jerks.”
21. A statement, dated March 13, 1948, by Dr. Rodman Shippen, Melrose, Massachusetts, reads as follows:
Mr. Kells Boland had come to me complaining of muscular jerking and momentary blank spells. A neurological examination failed to disclose any significant findings. He has been taking tridione for the past 8 weeks with marked benefit — with the result that his complaints have practically disappeared. In spite of EEG findings which are said to be negative, in the light of the history and response to therapy I believe a diagnosis of petit mal is justified.
22. On March 24, 1948, plaintiff was given a physical examination by the Veterans Administration. His complaints were listed:
The same as previously reported. Spasmodic jerking of the arms and at times of the legs, causing me to stumble. These are almost short blackout periods except that they are very quick and unpredictable.
The report of plaintiff’s history includes the statement that plaintiff believed that he was adjusting well in his position with the cordage company and that he had lost no time from work because of illness, though he might well have been *163 absent from work following a fall wliicli lie bad as a result of bis ailment. Tbe report of plaintiff’s history also includes the statement that muscle spasms of his hands occasionally caused him to drop something while he was at work, but that he had been able to cover up his ailment. Plaintiff stated to the examining doctor that since he had been out of service, he believed that he had gradually grown worse. The examining doctor stated in the report:
To this Examiner the symptomatology, as outlined, indicates a conversion reaction. However since the ? of petit mal epilepsy has arisen, it is thought advisable to have an EEG [electroencephalogram[4]] performed and diagnosis will be deferred pending receipt of the report on this examination.
Immediately following the foregoing statement in the report the following handwritten notation (apparently written at a later date) appears:
It is to be noted that the differentiation between epilepsy and hysteria with conversion is often difficult, sometimes impossible, to make. Despite the opinion expressed above, as to the characteristics of clinical symptoms, it is felt that in the light of the E.E.G. findings a diagnosis of Epilepsy, Grand Mai is indicated.
The diagnosis in the report was epilepsy, grand mal, moderately severe.
23. On November 16, 1948, the Veterans Administration rated plaintiff “8900 Epilepsy, Grand Mai, 30% from 10-28-47. Incurred in WWTI.”
24. In 1949 plaintiff applied for a job as a nautical scientist at the Navy Hydrographic Office in Suitland, Maryland.
In connection with his application plaintiff was examined by a private doctor in Massachusetts who submitted his report to the Navy Hydrographic Office which notified plaintiff that he could not be appointed as a nautical scientist because *164 of bis physical disability. Thereafter, plaintiff enlisted the assistance of the American Legion and of Senator Leverett Saltonstall on behalf of his application, and under date of July 11, 1949, plaintiff submitted an affidavit, the body of which reads as follows:
I, Kells M. Boland of Duxbury, Massachusetts, on oath depose and say that I have been continuously employed by the Plymouth Cordage Company from. November 1947 to July 1949 and relinquished my position there in anticipation of my appointment as Nautical Scientist, as above referred to, feeling that I am fully qualified to carry on the duties of that position without any difficulty so far as physical condition is concerned. My certificate of medical examination duly filed with the Hydrographic Office shows a condition of “Petit Mai Controlled”. This condition came about during my service in the Pacific theatre in 1948 as Navigator of the U.S.S. Luzon. I subsequently served as Executive Officer and temporary commanding officer of a large A.K.A. until released from active duty after the end of the war in 1946. The hazard of climbing vertical ladders and similar duties make it inadvisable for me to follow my profession in the Merchant Marine. Rehabilitation and Medical Officers, after thorough examination, have recommended that I engage in the work of Nautical Scientist, and they and I are convinced that I have no physical disability which will interfere in any way with my efficient performance of the work required in this position.
In witness whereof, I have hereunto set my hand this eleventh day of July 1949.
25. On July 20, 1949, plaintiff was found’ by the Regional Office of the TJ.S. Civil Service Commission to be physically acceptable for the employment at the Navy Hydrographic Office, and shortly thereafter he began employment there as a Grade GS-7 in the Sailing Directions Branch of the Division of Maritime Safety. Plaintiff’s work required him to do precision plotting of courses on charts which were used in the navigation of ships. As a result of the tics (twitches) in his forearms plaintiff, on occasion, dropped the charting instruments which he was using in his work. Plaintiff’s employment ratings were all satisfactory and when he left the Navy Hydrographic Office in January 1961 to take a job *165 as transport economist at the Maritime Administration, where he was employed at the time of the trial (February 1961), he had risen to deputy branch head and was a grade GS-12. During his employment at the Navy Hydrographic Office the only sick leave which plaintiff took in connection with his tics was in order to go to the Veterans Administration for treatments (which occurred about twice a week, beginning in 1951 and continuing for approximately 2 years). Plaintiff testified that in 1949 the tics of the forearms were occurring on an average of one every other day, and that the tics of the legs might happen three times in a week and then not happen again for perhaps 6 months.
26. On May 10, 1950, plaintiff was given a physical and psychological examination by the Veterans Administration. The summary in the report of the examination reads:
This 31-year-old, white male has had spasmodic movements of extremities, which are uncontrollable at times, since 1944. They occur frequently during his work but don’t incapacitate him to such a degree that he has to stop working. He is. quite preoccupied with it. The neurological examination is negative. It is felt that we are dealing with a conversion reaction. The veteran is competent. Final diagnosis will be deferred.
Immediately following the summary, a handwritten notation appears as follows:
Diagnosis: Conversion reaction, autonomous type, moderate, formerly diagnosed epilepsy, grand mal.
5-19-50.
27. On January 1, 1951, plaintiff was given a quadrennial physical examination at the U.S. Naval Gun Factory in Washington, D.C. The report of the examination includes the following notation and diagnosis:
This 32 year old male gives a history of petit mal seizures. First experienced slight jerking of both arms and legs, as result he dropped things. Episodes lasted only a second, or so. No loss of memory associated. First seizure occurred in 1943. He did not consult medical attention until 1945. He was advised it was due to overwork. He was seen by VA in 1946 and 4 EEGs were noncontributory; however, he was awarded 30% disability compensation. His private physician *166 placed Mm on Tridione for approx 5 months in 1947 and the seizures definitely lessened. Since then he has not been on any medication and has approximately one seizure every two days. Each seizure lasts only a second or two and is associated with a sudden jerk of both arms and legs. Has fallen on occasion, hut always remembers what has happened. No grand mal seizures.
Epilepsy, petit mal (3530).
Plaintiff was found not qualified for assignment to active duty in event of war or national emergency, because of epilepsy, petit mal; and it was recommended in the report that plaintiff be honorably discharged or placed on the honorary retired list.
28. On June 3, 1952, plaintiff was given an examination by three neuropsychiatrists for the Veterans Administration who summarized their report as follows:
This 33-year-old white male has had spasmodic movements of the extremities, particularly of the hands since 1944; however, they were not considered disabling or of any significance while he was in the Navy. In 1946, he was considered to be a conversion neurosis by the examiner; in 1948, he was considered to be epilepsy, grand mal, although the electroencephalogram was entirely inconclusive and the tMrd one even completely negative. At the present time, he shows preoccupation with that condition and also some overtalkativeness and pressure of speech. He is definitely very anxious to be all right; however, there is some slight residual of having too much responsibility while in service. It is still felt that we are dealing not with any convulsive disorder, but with a conversion reaction, autonomous type, which occurs when responsibilities became too much for him. Final diagnosis, however, will be deferred until psychological tests and another electroencephalogram report will be available.
29. On June 25, 1952, an electroencephalogram was performed on plaintiff at a Veterans Administration hospital in Washington, D.C. The report noted the clinical impression as conversion reaction and the interpretation of the electroencephalogram as normal.
30. On July 30, 1952, a final diagnosis was inserted in handwriting in the report, referred to in finding 28 supra, as follows:
*167 Conversion reaction, hyperkinetic type, moderate— epilepsy not found. EEG negative.
31. On August 11, 1952, the Veterans Administration changed plaintiff’s disability rating from 30 percent disability for epilepsy, grand mal, to “30% from 10-28-47 conversion reaction hyperkmetic type, formerly diagnosed epilepsy, grand mal.”
32. On October 12, 1954, plaintiff was given a neuropsy-chiatric examination by a Veterans Administration neuro-psychiatrist, Dr. Ewald M. Jaffee. The report of the examination reads in part as follows:
medical history: The veteran has been attending Mental Hygiene Clinic twice a week for the past year, however does not see much progress yet.
PRESENT complaiNts : Spasmodic movements of the extremities, particularly of his hands which are uncontrollable at times but of short duration. They occur quite frequently. In the morning they are mostly jerky in nature and they occur mostly when he has to do things which he does not like to do or when he is under strain. The veteran still is intolerant for continuous noise and for crowds; he gets excited and irritable more frequently than in the past.
neurological examination : Essentially negative.
mental examination: This is a thirty-six-year-old white male, well developed, well nourished, not acutely ill, well dressed and clean and neat in appearance. The veteran answers questions readily; he is still somewhat overtalkative and has some pressure of speech; however, he does not seem to be overly restless, irritable or depressed. He is still quite preoccupied with his condition, more so than he was in the past when he was examined here last. He still drops objects easily and that is very embarrassing when he helps his wife washing the dishes. The veteran is still afraid of flying, of riding in automobiles in traffic and also of being in closed places like elevators. Otherwise his condition is essentially about the same as it has been described in previous examinations.
summary : This thirty-six-year-old white male has had spasmodic movements of his extremities, particularly of his hands, since 1944. Epilepsy has been ruled out by a neurological consultation, also by electroen *168 cephalogram. He is still somewhat overtalkative with a pressure of speech and shows mild claustrophobia and anxious preoccupation with his condition, which embarrasses him greatly and discourages him. He has, however, made a fairly satisfactory industrial and social adjustment. He is competent.
DIAGNOSIS: Conversion reaction, hyperkinetic type.
33. By letter dated November 24, 1954, plaintiff was notified by the Veterans Administration that his claim for disability benefits had been carefully reviewed, and that based upon all the evidence of record, including the report of the examination of October 12, 1954, no change was warranted in the prior rating action in his case. Plaintiff was advised that he could appeal the decision to the Administrator of Veterans Affairs at any time within 1 year from the date of the letter.
34. On September 13, 1957, plaintiff was given a neuro-psychiatric examination by a Veterans Administration neuropsychiatrist, Dr. Antonio Rodriguez. The neurological examination was negative, and the diagnosis was “Conversion reaction from history.” The summary in the report reads as follows:
This 39 year old white male has been making a good economic and social adjustment since discharge from service. He gives the history of shaking of arms which lasts only a second or so. Diagnosis of conversion reaction is continued.
35. On September 26, 1957, the Veterans Administration changed plaintiff’s disability rating from 30 percent for conversion reaction to “10% from 11-26-57 conversion reaction, hyperkinetic type, formerly diagnosed epilepsy, grand mal.”
36. By letter dated October 1, 1957, plaintiff was notified by the Veterans Administration that due to an improvement in his condition, the degree of disability from his service-connected disability should be reduced from 30 percent to 10 percent, and that as a result, his compensation had been reduced from $55 to $19 as of December 1, 1957. Plaintiff was advised that he could submit additional evidence within 60 days or appeal to the Administrator of Veterans Affairs within 1 year from the date of the letter.
*169 37. By letter dated November 15, 1957, addressed to the Director, Claims Service, Veterans Administration, plaintiff protested the reduction of his disability rating, and submitted a letter from his wife and letters from working companions and associates which recounted from personal observation an incident in which plaintiff was burned by dropping a container of boiling water, incidents in which plaintiff dropped instruments at his work, occasions in which plaintiff momentarily lost control of his movements while descending stairs— and similar occurrences, all in connection with plaintiff’s disability.
38. On November 22, 1957, a panel of three rating specialists of the Veterans Administration considered plaintiff’s letter of November 15, 1957, and those letters which accompanied it, and confirmed and continued plaintiff’s 10 percent disability rating. By letter of November 26, 1957, plaintiff was notified that the additional evidence had been considered but that no change in his disability rating of 10 percent was warranted.
39. The body of a letter dated September 24, 1958, addressed to Mr. James A. Doyle, Department of Veterans’ Affairs, Washington, D.C., from Desmond S. O’Doherty, M.D., of the Department of Neurology of Georgetown University Medical Center, Washington, D.C., reads as follows:
I have been asked by Mr. Kells Boland to give a summary of his medical condition. According to my records, which were previously the property of Doctor Bushnell Smith, who took care of Mr. Boland prior to this year, Mr. Boland had a clear cut case of epilepsy of the myoclonic and akinetic type of petit mal seizures. These began while serving in the South Pacific about 1943 or 1944. Complete neurological workup has not established any cause for this condition. No definitive diagnosis as to the cause of these was made either in the service or in subsequent examination. His progress through the years has been related to many attempts to control the seizures with standard and new medications. Only recently has there been any successful control of this _ pattern. However the withdrawal of his present medication from general use has made it impossible to continue him on this preparation. Therefore the prognosis is guarded as regarding full control of his seizures.
*170 It is not anticipated to do further diagnostic studies at this time or the near future.
40. On October 80, 1958, a hearing was held in Washington, D.C., on plaintiff’s case by a three-member Bating Board of the Veterans Claims Division of the Veterans Administration. Plaintiff personally appeared and testified and was represented by a Mr. Doyle of the American Legion. There were received in evidence on plaintiff’s behalf the letter of September 24,1958, from Dr. Desmond S. O’Doherty (finding 89 supra) and written statements from two other doctors. There were also received in evidence on plaintiff’s behalf statements from two laymen recounting incidents in which plaintiff dropped items because of the twitching of his arms.
41. On November 13,1958, the three-member Bating Board of the Veterans Claims Division of the Veterans Administration confirmed and continued plaintiff’s disability rating of 10 percent. By letter of November 18,1958, plaintiff was notified of the action of the Bating Board and was advised that his appeal was being certified for appellate consideration.
42. By letter dated November 25, 1958, plaintiff, through his attorney, transmitted to the Board for Correction of Naval Becords his application for correction of naval records, which was filed on November 26,1958. In the application plaintiff requested that his naval record be corrected to show that he was entitled to retired pay from January 12, 1946. Plaintiff alleged that at the time of his release from active duty he was suffering from epilepsy which incapacitated him for active service; and that his physical disability was permanent and an incident of the service. In support of his application he referred the Board to the record of the Veterans Administration and his Navy medical records.
43. On December 19, 1958, a three-member Board of Veterans Appeals of the Veterans Administration rendered its decision on plaintiff’s appeal, which reads in part as follows:
The Board has considered the entire evidence of record pertaining to conversion reaction, hyperkinetic type, including the testimony presented at the Begional Office hearing on appeal and concludes that it does not meet *171 the provisions of the applicable schedule for assignment of a rating in excess of the ten per cent (10%) evaluation, currently in effect. The appeal is denied.
44. The body of a letter, dated March 12, 1959, addressed to plaintiff’s attorney from Dr. Desmond S. O’Doherty of the Department of Neurology of Georgetown University Medical Center, Washington, D.C., reads as follows:
I am enclosing a summary of the medical report on Mr. Kells M. Boland.
According to records in my possession of Doctor Bushnell Smith, of Doctor Francis M. Forster and myself, the history is as follows: Mr. Boland first began to have his spells while serving in the navy as a ship pilot in the South Pacific in about 1943 or 1944. Pie did not know what they were at the time nor was the diagnosis apparently established mitil he was worked up at Boston in 1947, or 1948. He has been completely worked up and the cause for these has not been determined. However they do fit into the pattern of myoclonic jerks; therefore myoclonic epilepsy would be the most likely cause. He has been tried on various medications since that time. None of them have completely controlled him permanently. He has had some improvement with practically all the medications. Of my last discussion with Mr. Boland, he was still having spells every several days and it is not likely that he will come under complete control with the present routine. In summary then, this is a case of myoclonic and akinetic epilepsy which had its onset in the Service of 1943, and which has not been shown to be the result of infectious or neoplastic process of the brain and which is at present only partially controlled.
45. On March 17, 1959, Dr. Harold Stevens, Professor of Neurology and head of the Department of Neurology of George Washington University, Washington, D.C., gave plaintiff a neurological examination which included plaintiff’s history. On March 24, 1959, Dr. Stevens sent a letter to plaintiff’s attorney concerning his neurological examination of plaintiff, which letter reads in part as follows:
The patient has never had a convulsion and family history is negative for convulsive disorder or any heri-dodegenerative disease of the central nervous system.
*172 He received no treatment and had no EEG’s taken while in the Service. The last EEG was taken in October 1952 which I read as normal.
The neurological examination was negative and an EEG was requested. This was done at the Washington Hospital Center on March 19,1959. My reading of this EEG is the same as the prior one, i.e., it is normal
Based on the above history and examinations it is my impression that this syndrome is consistent with the diagnosis of “Beading Epilepsy.” The attacks typically occur with concentration, occur frequently associated with jerking of the jaw as well as with other sudden single, uncontrolled, stereotype, spontaneous movements. It is obvious from the record that the onset of these episodes occurred while he was in Military Service.
46. By letter dated June 22, 1959, plaintiff’s attorney transmitted to the Board for Correction of Naval Records a memorandum supporting plaintiff’s application for correction of his naval record. In the letter plaintiff’s attorney requested an oral hearing.
47. On February 2, 1960, a five-man Naval Physical Review Board, two members of which were from the Navy Medical Corps, met and examined plaintiff’s medical records and records and other data obtained from the Veterans Administration and from plaintiff, and under date of February 4, 1960, submitted an advisory opinion to the Board for Correction of Naval Records, which opinion reads in part as follows:
g. The petitioner’s Navy medical record, beginning with 13 December 1938, at which time he was physically examined for appointment as a Merchant Marine Cadet, to 22 September 1945, reveals nothing more remarkable than a procession of physical examinations for promotion, for duty involving both “lighter” and “heavier-than-air” training. On 22 September 1945, on board his last active duty station, (USS TATE), he was examined and found physically qualified for transfer to the Separation Center incidental to release from active duty. A close inspection of the documents which were appended to petitioner’s brief to the BCNR reveals that at his, petitioner’s, request the medical officer conducting the examination made the following entry in petitioner’s health record:
*173 “Mr. Boland gave recent complaints of nervous tic consisting of involuntary muscular contraction of forearm on rare occasions, particularly when under considerable mental stress. Examination reveals no organic basis for above and it is considered functional.”
Finally, when considered in the light of all the evidence available to this Board, the party’s alleged disability did not prevent him from satisfactorily serving on active duty, nor prevent him from being physically qualified for eventual promotion to LCDB. and that such disability as he alleged existed prior to his release from active duty was never observed by others and was only made a matter of record at his, the petitioner’s, request.
3. OPINION
After a complete review of all available records in this case, it is the opinion of the Board that LCDB Kells Marsh BOLAND, USNB (Hon. Bet), presented no disability at the time of his release from active duty on 11 January 1946; furthermore, the Board considers that at that time the petitioner was physically and mentally qualified in all respects for active naval service and the defect allegedly present in the petitioner subsequent to his release from active duty did not, and has not yet, become incapacitating so as to preclude his assignment to active duty. The Board is also of the opinion that since the records were complete, the interest of the party and the Government in this matter are so well protected that a formal hearing, with personal appearance, will not be necessary.
48. A letter dated February 5, 1960, from the President of the Naval Physical Disability Beview Board to the Chairman of the Board for Correction of Naval Becords, reads in part as follows:
2. On 4 February 1960, Mr. Donald H. Dalton, civilian counsel for LCDB BOLAND, called to see me concerning this case. Mr. Dalton had not been aware of the fact that this Board had completed the required action on the case. The counsel further stated to me, although he had requested an oral hearing before the BCNB, that he had no evidence as such to submit in addition to that which has appeared in the record and in the brief submitted by him.
3._ In view of the statement by counsel that he has no additional evidence to present, the advisory opinion submitted by the NPDBB in the case is adhered to.
*174 49. Plaintiff, through his attorney, filed with the Board for Correction of Naval Becords a Statement of Bebuttal to the advisory opinion of the Naval Physical Disability Be-view Board of February 4, 1960, and the letter, dated February 5, 1960, from the President of the Naval Physical Disability Beview Board to the Chairman of the Board for Correction of Naval Becords. The Statement of Bebuttal reads in part as follows:
7. The greatest error in the Board’s letter is that no mention is made of medication. No consideration has been given to the effect of medication on petitioner.
Petitioner has been on medication from October 24, 1947, to the present time. In 1947, he took dilantin sodium twice a day. Later, he took tridione, and is now taking milantin. Before that, he was medicated with PM 680 as prescribed by Dr. Bucknell Smith.
Medication has made the symptoms of epilepsy quiescent.
8. The denial of an oral hearing has produced a great injustice. An oral hearing is requested if petitioner does not prevail herein.
50. By letter dated February 25, 1960, the Chairman of the Board for Correction of Naval Becords requested the Chief of the Navy Bureau of Medicine and Surgery for an advisory opinion regarding plaintiff’s physical condition at the time of his release from active duty within the contemplation of the then existing laws. There were enclosed with the letter plaintiff’s medical records, the Veterans Administration records in the case, the advisory opinion of the Navy Physical Disability Beview Board, and the Statement of Bebuttal filed by plaintiff’s attorney.
51. On March 23, 1960, the Chief of the Navy Bureau of Medicine and Surgery sent to the Chairman of the Board for Correction of Naval Becords an advisory opinion which reads in part as follows:
2. This Bureau concurs with the opinion of the Physical Disability Beview Board that Lieutenant Commander Boland was at the time of his release from active duty physically fit to perform all the duties of his rank. The subsequent decision of the Veterans Administration to grant a 30% disability for his complaints in no way could or should influence a retroactive consideration of *175 the Navy finding of fit for full duty. Moreover, petitioner manifested no behavioral or performance symp-tomatology that could be considered an impairment of either his industrial or social adaptability at the time of his release to inactive duty.
3. The February 1960 Statement of Rebuttal to the Navy Physical Disability Review Board emphasizes the point that the board did not consider the fact that petitioner was afforded relief from his “convulsive seizures” through the use of anticonvulsants. It is noted that such relief was demonstrated only upon a subjective basis and it is emphasized that attempting to establish a causal relationship here is not medically indicated. Conversion reactions respond to all types of medical treatment and the usual physician-patient relationships are, by definition, psychotherapeutic relationships and introspective improvement in conversion symptomatology is to be expected.
4. It is therefore the opinion of this Bureau that there is no medical merit to subject petition.
52. A letter dated April 6, 1960, to plaintiff from the Executive Secretary of the Board for Correction of Naval Records reads in part as follows:
On 4 April 1960 the Board, pursuant to 10 U.S.C. 1552, reviewed your naval record and the evidence submitted in support of your contention that you should have been retired because of physical disability in 1946. The Board, a quorum being present, determined that insufficient evidence has been presented to indicate probable material error or injustice. Accordingly, your application was denied.
_ You are hereby advised of the denial of your application, and that you are privileged to submit new and material evidence for consideration.
53. Pertinent regulations of the Department of the Navy for application before the Board for Correction of Naval Records and entitlement to hearing provide as follows:[5]
¡J¡ I" cs, 'S*. $ Cb 3 § S- * bo „ 00
(e) Review of. application. Each application and tiie available military or naval records pertinent to the corrective action requested will be reviewed to determine whether to authorize a hearing or to deny the applica *176 tion without a hearing. The Board will make this determination in all cases except those in which the application has been denied administratively for the reason that the applicant has not exhausted all other effective administrative remedies available to him. In connection with any application which it considers, the Board may recommend to the Secretary that the records be corrected, as requested by the applicant, without a hearing. The Board may deny an application if it determines that insufficient evidence has been presented to indicate probable material error or injustice, that the applicant has not exhausted other effective administrative or legal remedies available to him, or that effective relief cannot be granted. The Board will not deny an application on the sole ground that the record or records involved were made by or by direction of the President or the Secretary in connection with proceedings other than proceedings of a board for correction of military or naval records. If the application is denied, the applicant will be advised of the denial and that he is privileged to submit new and material evidence for consideration.
§ 723.4 General; notice; counsel; witnesses; access to records — (a) General. In each case in which a hearing is authorized, the applicant will be entitled to appear before the Board either in person or by counsel of his own selection or in person with counsel.
*!» Í ^
§ 723.11 Miscellaneous — (a) Staff assistance. The facilities of all bureaus, offices and boards of the Navy Department shall be made available to the Board to assist it in the performance of its function.
54. During the years 1945 and 1946 the criterion used by the Navy to determine whether an officer was incapacitated for active duty was whether his physical condition was such that it did not permit his performance of the duties of his office in a reasonable manner. No disease or injury was considered incapacitating per se, and the fact that an individual was suffering from epilepsy, whether grand mal or petit mal, or from conversion reaction, was not in and of itself a sufficient basis to declare that the individual was incapacitated for active duty. In applying the criterion to an individual case, a number of factors were considered, including the nature of the disease or injury, its manifestations in the individual, and in what way it might impair *177 the individual’s performance of the duties which persons of the same grade and type of duties would be expected to perform.
55. Epilepsy is a seizure or convulsion, the basic cause of which is unknown in 85 percent of the cases. In the remaining 15 percent of the cases epilepsy is due to brain damage. The least incapacitating of the various types of epilepsy is petit mal epilepsy which is synonymous with myoclonic epilepsy and means “little seizure.” Reading epilepsy is one form of petit mal epilepsy. Grand mal epilepsy means “big seizure” and is the most incapacitating of the various types of epilepsy. An abnormal electroencephalogram is confirmatory of epilepsy, although 15 percent of normal people have a mildly abnormal electroencephalogram. Epilepsy can be controlled by medicine and an epileptic can then carry on an ordinary life and do normal work. In the State of Maryland epileptics are permitted to drive automobiles if they meet certain conditions relating to control of their seizures. Tics (muscle spasms, myoclonic jerks) are symptoms of both epilepsy and conversion reaction.
56. Conversion reaction[6] is a psychoneurotic disorder. Persons suffering from conversion reaction convert their overwhelming anxiety into some physical manifestation such as paralysis. A person with conversion reaction is no more likely to have an abnormal electroencephalogram than is a normal person.
57. The statistics in the Annual Reports of the Surgeon General of the United States Navy, Chief of the Bureau of Medicine and Surgery, to the Secretary of the Navy on diseases and noncombat injuries according to manner of admission and disposition from the sick list for the Navy and Marine Corps for 1945 and 1946 show that in 1945, out of a total of 2,989 patients with a confirmed diagnosis of psychoneurosis hysteria, 1,009 were returned to active duty; and that out of a total of 1,672 patients with a confirmed diagnosis of epilepsy, 366 were returned to active duty. In 1946, out of a total of 500 patients with a confirmed diagnosis of psychoneurosis hysteria, 288 were returned to active duty; *178 and out of a total of 520 patients with a confirmed diagnosis of epilepsy, 171 were returned to active duty.
58. Dr. Harold Stevens, Professor of neurology and head of the Department of Neurology at the George Washington University, testified as an expert in neurology on behalf of plaintiff. Dr. Stevens is certified both in psychiatry and in neurology by the American Board of Psychiatry and Neurology, and is consultant in neurology at a number of hospitals. As previously noted (finding 45 supra), Dr. Stevens gave plaintiff a neurological examination on March 17,1959, which was negative; and had an EEG performed on plaintiff on March 19,1959, which was normal. On November 14, 1960, another EEG was performed on plaintiff which was mildly abnormal. At the trial Dr. Stevens gave as his final diagnosis that plaintiff was suffering from reading myoclonic epilepsy which is a type of seizure precipitated principally by reading, although other stimuli or other forms of mental activity may also invoke the epilepsy. It was Dr. Stevens’ opinion that plaintiff’s condition first occurred in 1943. Dr. Stevens expressed the judgment that plaintiff was not qualified for active duty in 1946 because “If he passed out or his knees buckled or his arms jerked or he wasn’t constantly alert while in a position of responsibility, he would be dangerous to himself and others.” Dr. Stevens did not know the criteria used by the Navy in 1946 in determining whether an officer was incapacitated for active duty.
59. Bear Admiral Charles S. Stephenson, Medical Corps, United States Navy, Betired, who is not a neurologist and who had never treated an epileptic, also testified on behalf of plaintiff. Admiral Stephenson, a doctor of medicine, served from 1913 until 1944 in the Medical Corps of the Navy in various positions including chief of service, acting fleet surgeon, commanding officer of hospital ships, and director of the division of preventive medicine. Admiral Stephenson is an expert on the Manual of the Medical Department of the Navy. He testified that at the time of plaintiff’s examination for release from active duty, because of his symptoms, plaintiff should have been sent to a Navy hospital where there would be equipment necessary for an examination and determination of his physical condition. Dr. Stephenson stated that it *179 did not appear that plaintiff was ever given a neurological examination by either the Navy or the Veterans Administration as prescribed by the Manual of the Medical Department of the Navy. Dr. Stephenson has never examined plaintiff but, based upon his study of the records in plaintiff’s case, expressed the judgment that the weight of the evidence showed a diagnosis of epilepsy; and that with a diagnosis of epilepsy plaintiff should have been retired. Dr. Stephenson testified that although the Manual of the Medical Department of the Navy covering the years 1945 and 1946 did not provide that a man who has epilepsy will be incapacitated for active service, he had never heard of an epileptic in whose case the diagnosis was proved who was retained on active duty. He expressed the opinion that it would be a serious hazard for an epileptic to do sea duty and that it would not be a sound practice for an epileptic to carry medication (Dilantin) with him aboard ship.
60. Dr. Floyd H. Gilíes, Lieutenant, Medical Corps, United States Navy, was one of the witnesses for defendant. Dr. Gilíes is head of the department of neurology at the National Naval Medical Center, instructor of clinical neurology at Georgetown University Medical Center, Washington, D.C., and a diplomat of the American Board of Medical Examiners. He has examined and treated approximately 500 epileptics and on occasion has made suspected diagnoses of conversion reaction and referred the patients to psychia-tists. Dr. Gilíes has never examined plaintiff but, based upon his study of the records in plaintiff’s case and the description by plaintiff during the trial of his condition, agreed with the diagnosis of conversion reaction and disagreed with the diagnosis- of epilepsy. It was the opinion of Dr. Gilíes that irrespective of the diagnosis of the specific disease (whether epilepsy or conversion reaction) plaintiff was not, because of the nature of his complaints, incapacitated for active duty in 1946. Dr. Gilíes has served on a Navy medical board which returned a person suffering from petit mal epilepsy back to full active duty; but Dr. Gilíes had no-knowledge respecting the functions of a medical board during World War II or of the duties of a line officer at sea. *180 in 1946, since his service in the Navy has been since that time.
CONGL'CTSION op law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.

 Conversion reaction (synonymous with conversion hysteria) is a psy-choneurotic disorder. Persons suffering from conversion reaction convert their overwhelming anxiety into some physical manifestation such as paralysis. A person with conversion reaction is no more likely to have an abnormal electroencephalogram than is a normal person.

 The terms “ties,” “muscle spasms,” ana “myoclonic jerks” are synonymous and interchangeable.

 Delete inapplicable words.

 An electroencephalogram (EEG) Is a recording of the electrical potentials which originate in the brain and are transmitted through the skull to the surface of the head. They are picked up by electrodes applied to the head. Neither the electroencephalogram nor the report of the electroencephalog-rapher was attached to the report of plaintiff’s physical examination of March 24, 1948, supra.

 32 C.F.K. (1954 edition with 1961 Cumulative Pocket Supplement).

 Conversion reaction is synonymous with conversion hysteria.