Per Curiam:
This case was referred to Trial Commissioner James F. Davis with directions to make findings of fact and recommendation for conclusions of law under tbe order of reference and Buie 57(a). Tbe commissioner bas done so in an opinion and report filed on October 4,1967. Exceptions to tbe commissioner’s opinion, findings and recommended conclusion of law were filed by plaintiff and tbe case bas been submitted to the court on oral argument of counsel and the briefs of tbe parties. Since tbe court is in agreement with tbe opinion, findings and recommended conclusion of law of the commissioner, with a slight modification in one finding, it hereby adopts tbe same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover and his petition is dismissed.
OPINION OP COMMISSIONER
Davis, Commissioner:
Plaintiff seeks to recover disability retirement pay, less severance pay and Veterans Administration (VA) compensation, from tbe time he was removed from tbe Navy Temporary Disability Eetirement List (NTDEL) and discharged from tbe Navy in 1961. Tbe issue is whether tbe decision of tbe Board for Correction of Naval Eecords (BCNE) that plaintiff was properly discharged at a disability rating of 20 percent, rather than 40 percent, was arbitrary, capricious, and not supported by substantial evidence.
Plaintiff’s contention of errors by tbe BCNE is two-pronged : First, in light of medical testimony in this court, the board’s bolding is not supported by “tbe weight of the evidence”; and, second, tbe board committed procedural error in refusing plaintiff an oral bearing and in failing to consider certain medical reports. Tbe facts are as follows:
In June 1954, plaintiff, while in Navy Officer Candidate School, injured bis back moving furniture in a barracks. From that time until December 1956, when be was placed on tbe NTDEL, plaintiff was hospitalized 110 days in various Navy hospitals for evaluation and treatment. His condition, originally diagnosed lumbo-sacral sprain, was ultimately diagnosed herniated disc. Between periods of hospitalization *272 and periodic attacks of lower back pain, plaintiff was able to perform Ms duties. In October 1955, be was found physically qualified for promotion.
In October 1956, after a further series of attacks and an unsuccessful period of treatment, plaintiff was examined by a board of medical examiners wHch made a final diagnosis of herniated disc and recommended that plaintiff appear before a Physical Evaluation Board (PEB). The PEB recommended that plaintiff be considered unfit for duty by reason of a herniated disc rated “severe” and considered 40 percent disabling in accordance with VA Diagnostic Code 5298. (See finding 20(b).) The PEB recommended that, in accordance with the Career Compensation Act of 1949,[1] plaintiff be placed on the NTDRL.
The Navy Physical Review Council (PRC) and Judge Advocate General (JAG) concurred in the PEB recommendation and plaintiff was placed on the NTDRL on December 1, 1956.
Pursuant to the requirements of the Career Compensation Act of 1949,[2] plaintiff was physically examined every 18 months for the next 5 years, during which time he was employed full time in civilian jobs, first in the investment business in New York and later with the U.S. Department of State as a foreign service officer. His condition, as reported on the periodic physical examinations, was essentially static, although it appears from the record that he was incapacitated less time than when he was on active duty in the Navy.
After Ms final physical examination in February 1961, plaintiff testified before a PEB that he still experienced pain and discomfort in the lower back with “acute episodes” occurring about once a month. He further testified that he had lost 5 to 10 days’ work during the past year; that he had difficulty driving a car for more than one or two hours; that he used a sleeping board and a special orthopedic mattress; and that he was precluded from other than sedentary employment or a desk job. At the hearing before the PEB, plaintiff was *273 physically examined by the medical member of the board. The board concluded that plaintiff was unfit for duty by reason of the same diagnosis as was made in 1956, i.e., herniated disc, except that plaintiff’s condition was considered “moderate” rather than “severe” within the meaning of the YA Diagnostic Code and, accordingly, plaintiff’s percent disability rating was changed from 40 to 20.
The record of the PEB was submitted for review to the PRC, which advised plaintiff that notwithstanding the findings of the PEB, it intended to recommend to the Secretary of the Navy that plaintiff was fit for duty. Plaintiff was invited to rebut.
Plaintiff submitted a rebuttal which included a statement of counsel and a medical report of a recent physical examination. After considering plaintiff’s rebuttal, the three-man PRC, hopelessly split, recommended as follows: The representative of the Chief of Naval Personnel — unfit for duty, 20 percent disability; the representative of the Chief, Bureau of Medicine and Surgery — fit for active duty; and the representative of the JAG — unfit for duty, 40 percent disability.
Paced with conflicting recommendations, the Naval Physical Disability Review Board (NPDRB) advised plaintiff that three of its five members agreed that plaintiff was disabled and unfit for duty with a disability rating of 10 percent. The two remaining members agreed with the PEB that plaintiff was unfit for duty but with a disability rating of 20 percent.
Plaintiff then requested and was granted a hearing before the NPDRB, at which hearing, plaintiff was represented by counsel. At the conclusion of the hearing, the two medical members of the board recommended to the other board members that the board be recessed “so that conflicting medical evidence could be reviewed.” To this end, certain clinical records and X-rays were obtained from commands where plaintiff had served while on active duty. The board also directed plaintiff to appear for a physical examination at the U.S. Army Hospital, Orleans, France.[3]
*274 The board reconvened in August 1961 and considered new evidence, vis., (1) the medical report of the U.S. Army Hospital, Orleans, France, including X-rays; and (2) X-rays and medical reports of civilian doctors, based on examinations in June 1961. After consideration of all the new and old evidence, the NPDRB recommended to the Secretary of the Navy that plaintiff be discharged with severance pay and 20 percent disability. The NPDRB concluded its report by stating:
The objective findings of repeated physical examinations [after release from active duty] are of milder degree than those elicited while on active duty.
After approval by the Secretary of the Navy of the NPDRB recommendation, plaintiff’s name was removed from the NTDRL and he was honorably discharged on November 30, 1961, with severance pay of $2,280.
After being placed on the NTDRL in 1956 and up to 1965, plaintiff was periodically examined for physical disability evaluation by the YA. His condition was diagnosed herniated disc; and, based on examinations conducted in February and October, 1957, plaintiff was assigned a 10 percent disability rating. This was within one year of the time plaintiff was placed on the NTDRL at 40 percent disability. In 1963, the VA rating was changed from 10 to 20 percent on the basis of examinations by two civilian doctors in France where plaintiff lived at the time. During 1963-64, plaintiff had numerous attacks of low back pain requiring medical treatment. One such attack was in April 1964. The attending physician concluded in his report that plaintiff’s condition was “definitely deteriorating.”
In September 1964, plaintiff made claim to the YA for an increase in disability rating. Pursuant thereto, the YA selected three civilian physicians in London, where plaintiff lived, to conduct physical examinations and submit the results to the YA for evaluation. In light of such physical examinations, which showed for the first time a narrowing of the disc space between vertebrae, disc degeneration, and some straightening of the spine, the YA in February 1965 *275 increased plaintiff’s disability rating to 40 percent. The VA rating decision stated in part:
The consensus of the examiners’ opinions and the current X-rays indicate the veteran’s back condition has increased in severity and a greater evaluation is in order.
On June 16, 1964, plaintiff applied to the BCNE, to have his name placed on the Permanent Eetired List (PEL). He submitted with his application statements and reports of various doctors, and requested a hearing. The BCNE, in accordance with its usual practice, requested the Bureau of Medicine and Surgery (BMS) to advise “whether subject’s disability was properly evaluated under the Veterans Administration’s schedule for rating disabilities at the time of his discharge on November 30, 1961.” Further, the BCNE stated in this connection—
It is requested that the records of the Veterans Administration, Claim No. 19916975 [plaintiff’s claim number] be consulted.
On June 18, 1965, the BMS recommended to the BCNE that plaintiff’s application be denied, stating that the findings of the VA had been consulted as requested.
On July 21, 1965, the BCNE advised plaintiff of the advisory opinion of the BMS. Plaintiff was invited to rebut and he did so by a letter statement. The statement was sent to the BMS which considered it but adhered to its previous recommendation.
On October 21,1965, the BCNE denied plaintiff’s application for correction without a hearing.
At the trial in this court,[4] the parties, not unexpectedly, elicited conflicting medical testimony from expert witnesses. Plaintiff’s witness, a civilian neurologist, was of the opinion that plaintiff’s disability was ratable at 40 percent at the time of removal from the NTDEL in 1961. Defendant’s witnesses, both Navy doctors, were of the opinion that plaintiff was fit for duty at that time.
Before discussing plaintiff’s allegations of error, it is pertinent to state once again that the function of this court in *276 reviewing boards for correction of military records is to determine whether the board’s action is arbitrary, capricious, and not supported by substantial evidence. Nichols v. United States, 158 Ct. Cl. 412 (1962) ; Snell v. United States, 168 Ct. Cl. 219 (1964). It is not the function of this court to substitute its own judgment for that of the board. Plaintiff has the burden of proving by clearly convincing proof that the board or the Secretary acted arbitrarily or capriciously. Wesolowski v. United States, 174 Ct. Cl. 682 (1966).
Plaintiff’s allegation of procedural error is based on (1) the BCNR’s refusal to grant a hearing and on (2) alleged failure by the BCNR. to consider certain medical documents. The BCNR is not required to grant a hearing to all applicants. Wales v. United States, 132 Ct. Cl. 765, 130 F. Supp. 900 (1955) ; Boland v. United States, 169 Ct. Cl. 145 (1965). A hearing is required only when review of applicant’s available military records indicates “probable material error or injustice.” This court said in Harris v. United States, 177 Ct. Cl. 538, 548 (1966), that a hearing should be granted when lower boards “differ in their submitted conclusions, or if the procedures in certain of them are so substantially defective as to preclude reliance on their advice * * Plaintiff was accorded all procedural safeguards by every lower board. He does not contend otherwise. As for differing conclusions reached by lower boards, no board found plaintiff 40 percent disabled after 1956. Nor did' the VA until 1965, when it concluded that plaintiff’s back condition “has increased in severity,” a conclusion reached on the basis of medical reports showing disc degeneration, narrowing of the disc space between vertebrae, and some straightening of the spine, none of which were found in earlier examinations.[5]
*277 Plaintiff further contends that the BCNE failed to consider certain medical reports filed with the YA. Specifically, after plaintiff applied to the BCNE for correction of his record, he was examined at the request of the YA by three civilian physicians whose reports were submitted to the VA. Based on these reports, plaintiff’s disability rating was ultimately changed by the YA to 40 percent. Plaintiff contends that the BCNE did not consider such reports, despite request by his counsel that it do so.
The record does not support plaintiff’s contention. The reports in question were received, stamped, and presumably put in plaintiff’s YA claim file on January 27, 1965. The BMS, upon request of the BCNE on April 28, 1965, considered plaintiff’s record including the YA files; and on June 18, 1965, it reported to the BCNE that, in reaching its opinion and recommendation, it had considered “the findings of the Veterans Administration.” The BMS, as well as the examiner for the BCNE, referred specifically to the 40 percent rating of the YA, which indicates without question that it had before it the rating decision and presumably also supporting medical reports of the YA upon which the 40 percent rating was based.
Plaintiff’s principal allegation of error is that the “weight of the evidence adduced at trial” shows plaintiff should have been placed on the PEL at 40 percent disability in 1961, rather than discharged at 20 percent rating. Plaintiff’s position is that since he was originally rated 40 percent disabled in 1956 and his condition remained “static” for five years thereafter, it was arbitrary and capricious to reduce his rating in 1961 to 20 percent.
The argument is without merit. The fact that plaintiff’s condition was reported “static” over the five-year period he was on the NTDEL does not mean his disability rating remained 40 percent. None of the periodic medical reports rated plaintiff’s condition. See Wesolowski, supra. There is abundant evidence in the record from which to conclude that plaintiff’s condition, although presumably ratable at 40 percent at the time of discharge in 1956, had lessened in severity by 1961 to 20 percent. The fact it deteriorated after 1961, a reasonable conclusion based on medical reports between 1961 *278 and 1965, is a matter for consideration by tbe YA, and in fact plaintiff is receiving YA benefits. See Johnston v. United States, 157 Ct. Cl. 474 (1962).[6]
The evidence elicited in this court does not undermine the decision of the BCNR. Plaintiff’s expert and one of defendant’s experts, both of whom were familiar with the YA Diagnostic Code for rating disabilities for herniated discs, testified regarding their understanding of the terms “severe” and “moderate” as used in the Code. (See findings 21(b) and 28(e).) The experts agreed that in determining the rating to be given, one must consider not only objective medical findings, i.e., results of physical examinations and X-rays, but also factors such as time lost from work, severity and frequency of attacks, etc.[7] Plaintiff contends such factors were not given due weight by the BCNE and lower boards in reaching conclusions on disability rating. The record does not support such contention. Plaintiff, by his own testimony, admitted he was incapacitated significantly less time after release from active duty than before. (See findings 10 and 12(a).) And each lower board, when considering plaintiff’s condition, had before it up-to-date reports of civilian and military doctors, as well as the testimony, where appropriate, of plaintiff himself who described in detail the subjective aspects of his condition. Thus, giving due regard to the *279 expert testimony, as well as the words and structure of Code 5293 and the record as a whole, plaintiff’s condition in 1961, based on his medical history from injury in 1954, was properly rated “moderate.”
The decision of the BCNR was supported by substantial evidence and therefore was not arbitrary or capricious.
FINDINGS oe Fact
1. (a) Plaintiff was born in Newark, New Jersey, on March 26,1931, and is presently a resident of the District of Columbia.
(b) On June 3, 1954, after attending Officer Candidate School, Newport, Rhode Island, he was commissioned an ensign, Supply Corps, ITSNR, and was promoted to lieutenant (j.g.) on October 12,1955.
(c) On December 1, 1956, he was placed on the Navy Temporary Disability Retired List (NTDRL) with a disability rating of 40 percent.
(d) On November 30, 1961, he was honorably discharged from the Navy by reason of physical disability, with severance pay.
(e) In this suit, he seeks to recover the disability retirement pay of a lieutenant (j.g.), from November 30,1961, less severance pay and disability compensation received from the Veterans Administration (VA).
2. While attending Officer Candidate School in April 1954, plaintiff suffered an injury to his back while moving furniture in a barracks, causing pain and inability to straighten up. The following morning, he was treated at the Navy Dispensary.
3. By July 1954 while on active duty at the U.S. Navy Supply Corps School, Athens, Georgia, plaintiff suffered recurrence of the back symptoms. X-rays were taken of his spine and the medical report at that activity reads in part:
The scoliosis of the spine may be due to spasm of the muscles or evidence of a disc injury * * * There is joint tenderness in midline over lumbosacral joint, exaggerated by lateral movement or extension of spine. Marked paravertebral muscle spasm bilaterally. * * * Forward bending unlimited. Neurological examination negative.
*280 4. (a) On July 30, 1954, plaintiff was transferred to the U.S. Naval Hospital, Charleston, South Carolina, for treatment and disposition with a diagnosis of “sprain, lumbosacral #8321.” On the same day the diagnosis was changed to “SPONDYLOLISTHESIS #1585.” On August 3, 1954, following a period of treatment, the diagnosis was changed to “LUMBEOSACEAL STEAIN #8331.”
(b) During the last six months of 1954, plaintiff had recurrent attacks which were treated by diathermy without appreciable effect on the pain.
5. (a) In January 1955, following a period of exacerbation, a diagnosis of “Chronic Eecurrent Lumbo-sacral Sprain” was made.
(b) On February 7, 1955, plaintiff was referred to the Orthopedic Clinic, U.S. Naval Hospital, Bethesda, Maryland, for examination and recommended treatment. The following statement was made on plaintiff’s consultation sheet:
23 yr old Cauc Ensign U.S.N. Supply Corps. Strained low back while in O.C.S., April 1954. Eecurrent mild disturbing attacks which are becoming more constant. Not occupationally incapacitating. Studied orthopedically at Charleston Navy Hospital, July 1954 — all X-Eays neg. Discharge Dx — Chronic Lumbo-sacral sprain. Sx since then status quo. Back examination negative except for
ill Increased (slight) Lordosis.
(2) Minimal point tenderness midline L-Sartic involving first 2 sacral segments.
(3) Accentuation of pain hyperextension of back.
Please examine and recommend Ex since all conservative Ex including diathermy, adhesive strapping, manipulations, local heat, bed boards, etc., etc., have been to no avail.
(c) On March 29, April 5, April 14, and May II, 1955, plaintiff consulted Navy medical authorities, following recurrence of symptoms. During that period it was reported, in part:
* * * Except for a trial of a flexion-body cast, * * * there is no other suggestion we can offer other than—
ill Heat
(2) William’s exercises (for at least 3 mo)
(3) L.S. brace (canvas)
*281 This man’s problem has not, so far, responded well to therapy.
(d) In August 1955, plaintiff was again hospitalized at Bethesda Naval Hospital for nine days, following another episode of low back pain and inability to stand fully erect. The summary of the medical report stated that attacks had been “coming on approximately every 2 months and relieved by osteopathic manipulations.” The medical report concluded as follows:
Impression: Lumbo Sacral strain, with psychogenic over lay. Patient’s recovery was uneventful and was discharged to full duty.
6. On September 27, 1955, plaintiff was examined and found physically qualified for promotion to the rank of lieutenant (j.g.) and to perform all the duties of his rank at sea or on foreign service.
7. (a) On January 31,1956, while on active sea duty, plaintiff suffered a recurrence of his back problem. At the U.S. Naval Hospital, Naples, Italy, his condition was diagnosed as a “herniated IY disc & may require surgery.” That hospital recommended neurosurgery consultation.
(b) On March 29,1956, plaintiff reported to the U.S. Naval Hospital, St. Albans, New York, for neurosurgery evaluation. Diagnosis was “herniated nucleus pulposus L4-L5, right, * *
(c) Between May and July, 1956, plaintiff was twice treated at the St. Albans Naval Hospital. Diagnosis was “HERNIATION OF NUCLEUS PULPOSUS, L4-5, RT., #7360.” The medical report dated May 15, 1956, reads in part:
IMPRESSION: The patient probably has some radi-culitis related to disc disease but the findings are very mild.
PROGRESS: Plaster jacket applied, patient ambulatory. No relief of the symptoms was obtained. The patient is fit for limited duty. Surgery is not indicated at this time & the results with the cast seem to indicate that a brace would not help him. It will probably be best for him to return to duty to see how he gets along in the warmer weather due now. Since his work is largely confined to office procedures & the ship is in port there seems *282 no reason to survey him to limited duty without stronger indications.
(d) On August 15,1956, plaintiff appeared before a Board of Medical Survey which recommended that he be sent to limited duty for a period of six months, not requiring strenuous use of the back, and that he be returned for reevaluation at the end of the period.
(e) On September 10, 1956, plaintiff was again admitted to the St. Albans Naval Hospital. The medical report reads in part:
The history and findings indicate that the patient has had recurrent back and leg disability probably the result of intravertebral [sic] disc pathology. Because of the lack of well marked physical findings and negative myelography, surgery was not considered indicated. Between attacks the patient is capable of full activity but the frequent recurrence of back pain and disability have prevented the full performance of his job. * * *
8. (a) On October 1, 1956, plaintiff appeared before a Board of Medical Examiners (BME) at St. Albans Naval Hospital where a final diagnosis of “HERNIATION, NUCLEUS PULPOSUS, RIGHT, L5-S1 (#7360)” was made. The BME recommended that he be ordered to appear before a Physical Evaluation Board (PEB).
(b) On October 16,1956, plaintiff appeared before a PEB at St. Albans Naval Plospital. The board made the following recommended findings: Unfit for duty by reason of herniation, nucleus pulposus, right, L5-S1, rated as intervertebral disc syndrome, severe, considered 40 percent disabling in accordance with VA Code No. 5293, may be permanent.
9. On November 5,1956, the Navy Physical Review Council (PRC) concurred in the PEB’s findings.
10. On November 26, 1956, the Judge Advocate General approved the findings of the PEB as concurred in by the PRC, and directed, on behalf of the Secretary of the Navy, that plaintiff be placed on the NTDRL for physical disability of 40 percent in accordance with the VA Schedule for Rating Disabilities. From the date of injury until plaintiff was *283 placed on tbe NTDKL, he was hospitalized 110 days in various Navy hospitals.
11. (a) On April 1,1958, plaintiff appeared before a BME at St. Albans Naval Hospital for a periodic physical examination. The BME advised the PEC, in part:
* * * # *
Evaluee states he continues to have episodes of low-back and rt. thigh pain. He has almost constant low back discomfort and wears a brace. On an average of every 6-wks., he has a more acute episode of low back pain with pain radiating into the rt. antero-lateral thigh. The area of numbness of the thigh has remained unchanged. His work is sedentary. Driving for a half-hour increases the symptoms.
% if: * * *
(b) On October 6,1959, plaintiff appeared before a BME at St. Albans Naval Hospital for another periodic physical examination. As a result of such examination, the BME advised the PKC, in part:
* * * * *
This 28 year old white male is at the current time employed as an office worker for a real estate and mortgage firm. He has continued to have essentially similar symp-tomatology since the last evaluation, that is low back and right leg pain of an intermittent nature. He has symptomatology of low back distress recurring approximately every 1 to 3 months with associated stiffness and numbness in the right thigh. The episodes are of 2 to 4 days in duration and frequently require the use of a low back support to ameliorate the symptomatology. His low back distress is frequently aggravated by prolonged driving or excessive effort. He will occasionally awaken with stiffness of the low back. He has had no left leg distress and there is no cough, strain, or sneeze aggravation. Because of an “essentially normal myelogram” no previous surgery has been performed.
❖ ❖ # ❖ ❖
It is the opinion of the Board that this patient has remained essentially static from his last examination.
(c) On February 1,1961, plaintiff appeared before a BME at Bethesda Naval Hospital for a final periodic physical ex *284 amination. The findings of that board dated February 8, 1961, read in part:
Since retirement the symptoms are unchanged — back pain and numbness right leg. Need for medical attention. The patient has consulted a local Medical Doctor two times but has received no specific treatment. * * *
The patient’s condition at present is as follows: The patient has numbness in the right anterior thigh. He is able to maintain a desk position but is limited m that he is unable to drive a car, participate in sports or walk for long distances. He is required to periodically wear a back brace.
iK # ifc #
12. (a) On February 23, 1961, subsequent to the final periodic physical examination, plaintiff appeared before a PEB. He testified in his own behalf, in essence, as follows: That he experienced pain and discomfort in the lowest region of his back with occasional pain down the right leg; that “acute episodes” of pain occurred about once a month, requiring four or five days’ bed rest; that he had lost five to ten days’ work during the past year; that he had difficulty driving a car for more than one or two hours; that he used a sleeping board and a special orthopedic mattress; and that he was precluded from other than sedentary employment or a desk job.
(b) During the hearing before the PEB, the medical member of the board examined plaintiff at his counsel’s request.
(c) The PEB concluded that plaintiff was unfit to perform the duties of his rank because of physical disability, described as: “5293, intervertebral disc syndrome, moderate recurring attacks — 20%.” This latter description reduced plaintiff’s disability rating, from 40 percent on the NTDRL, to 20 percent.
13. (a) The record of proceedings before the PEB was submitted to the PRC for review and recommended findings. On March 14, 1961, the PRC advised counsel for plaintiff that it intended to recommend to the Secretary of the Navy that plaintiff was fit for duty. Plaintiff submitted in rebuttal a statement of counsel and, in addition, a report dated April 11, 1961, of Dr. L. S. Lipsitch, Chief of Medical Service, *285 American Hospital of Paris, of a physical examination made on plaintiff April 7 and 8,1961, which report concluded that there was no evidence of amelioration of plaintiff’s symptoms since 1956.
(b) On April 21,1961, 'after considering plaintiff’s rebuttal documents, the PRC advised the NPDRB that: (1) The representative of the Chief of Naval Personnel on the PRC concurred with the findings of the PEB and their adoption would result in the party’s separation; (2) the representative of the Chief, Bureau of Medicine and Surgery (BMS), on the PRC did not concur in the findings of the PEB and would find the party fit for duty; (3) the representative of the Judge Advocate General on the PRC concurred with the findings of the PEB except that he felt the disability was ratable at 40 percent (instead of 20 percent), which would result in the party’s permanent retirement. This representative felt, prior to the party’s rebuttal, that he was fit for duty.
14. (a) On April 28, 1961, the NPDRB advised plaintiff that it proposed the following prima, facie findings:
A majority (three of five members) of the Naval Physical Disability Review Board concurs with the recommended findings of the Physical Evaluation Board, except that the party’s disability is more properly ratable under VA Code 5295, as rated by analogy to 5294,10%, with the diagnosis of Strain, Chronic, Lumbo-sacral area, #8331. The two remaining members concur with the recommended findings of the Physical Evaluation Board, Unfit — 20%.
(b) Plaintiff thereupon requested a hearing.
15. (a) On May 24,1961, the NPDRB reconvened to consider plaintiff’s case. Plaintiff was represented by counsel. At the conclusion of the hearing, the two medical members of the board recommended to the other board members that the board be recessed “so that conflicting medical evidence could be reviewed.” To that end the board directed that certain clinical records and X-rays from the U.S. Naval Supply Corps School Dispensary in Athens, Georgia, and the Charleston Naval Hospital be obtained. The board also directed that plaintiff be ordered to appear at the U.S. Army Hospital (La Chapelle), Orleans, France, for a special physical examination.
*286 (b) On July 11,1961, plaintiff was examined at the U.S. Army Hospital (La Cbapelle), Orleans, France. After stating a full history of plaintiff’s back condition, the examining doctor’s report stated, in part:
IMPKESSION: The findings of diminished sensation along the lateral right thigh could well be compatible with a herniated disc; however, at the time of this examination there are no other findings to further substantiate this diagnosis. This man’s work has been of a rather sedentary nature since discharge from the Navy, and it has been my recommendation that his activities be increased, specifically in the form of flexion exercises for the back and I recommended, also, increased recreational activities in the form of golf and swimming.
(c) On August 14, 1961, the hearing before the NPHBB was reconvened. New evidence was introduced, viz., (1) the medical report of the U.S. Army Hospital, Orleans, France (finding 15(b)), including X-rays; (2) X-rays taken of plaintiff’s spine on June 12,1961, by Hr. Meot of the American Hospital of Paris, together with his interpretation thereof; and (3) a medical report dated June 17, 1961, of Hr. Ambrose B. Hampton of the American Hospital of Paris.
(d) After reconsideration of all new and old evidence, the NPHBB recommended in a report to the Secretary of the Navy that the findings of the PEB which recommended discharge with severance pay, 20 percent disability, be approved. The NPHBB concluded its report by stating:
The objective findings of repeated physical examinations [after release from active duty] are of milder degree than those elicited while on active duty.
16. (a) On September 26,1961, the Judge Advocate General, after reviewing the NPHBB proceeding, recommended approval to the Secretary of the Navy.
(b) On September 29, 1961, the Secretary approved the recommended findings of the PEB as concurred in by the NPHBB.
(c) On November 30, 1961, plaintiff’s name was removed from the NTHBL and he was honorably discharged by reason of physical disability, with severance pay of $2,280.
*287 17. (a) After being placed on the NTDEL in 1956 and up to 1965, plaintiff was periodically examined for physical disability evaluation by the VA. Based on examinations conducted February 6, 1957 and October 11, 1957, plaintiff was assigned a 10 percent disability rating.
(b) At the direction of the VA, plaintiff was examined by two civilian doctors in December 1962 and January 1963. On April 18,1963, plaintiff’s disability rating was changed from 10 percent to 20 percent.
(c) During 1963-64, plaintiff had numerous attacks requiring medical treatment. One such attack was in April 1964. The attending physician concluded in his report that plaintiff’s condition was “definitely deteriorating” over the past 10 years.
(d) On September 15, 1964, plaintiff made claim to the VA for an increase in disability rating. Pursuant thereto, the VA selected three civilian physicians to conduct physical examinations and submit the results to the VA for evaluation. The examinations showed that for the first time there was a narrowing of the disc space between vertebrae, some disc degeneration, and some straightening of the spine.
(e) Upon reevaluation of plaintiff’s case in light of medical reports of 1964 (finding 17(d)), the VA on February 12, 1965, increased plaintiff’s disability rating to 40 percent. The VA Eating Decision stated in part:
‡ ‡ *
The consensus of the examiners’ opinions and the current X-rays indicate the veteran’s back condition has increased in severity and a greater evaluation is in order.
18. (a) On June 16, 1964, plaintiff applied to the Board for Correction of Naval Kecords (BCNE) to have his name placed on the Permanent Eetired List (PEL). He submitted with his application statements and reports of various doctors, tie requested a hearing.
(b) On April 28, 1965, the BCNE requested the Chief, BMS, to advise the board “whether subject’s disability was properly evaluated under the Veterans Administration Schedule for Eating Disabilities at the time of his discharge on 30 November 1961.” Further, the BCNE stated: “In this *288 connection, it is requested that the records of Veterans Administration, Claim Number 19 916 975, be consulted.”
(c) On June 18, 1965, the Chief, BMS, sent an advisory opinion to the BONN, recommending that plaintiff’s application for correction of Ms record be denied. The opinion stated that the findings of the VA had been consulted, as requested.
(d) The VA file in plaintiff’s case, as of June 18,1965, included the medical reports noted in findings 17 (d) and (e).
(e) In reaching its conclusion to recommend denial of plaintiff’s application (finding 18(c)), the BMS also had before it a report dated June 4, 1965, of Dr. Bodney Sweet-nam who examined plaintiff on June 1,1965, during a recurrence of low back pain.
(f) On July 21, 1965, the BCNB advised plaintiff of the advisory opinion of the Chief, BMS. Plaintiff was invited to rebut. He did so by letter dated August 13,1965, which letter was referred by the BCNB to the Chief, BMS, for comment and recommendation.
(g) On September 16, 1965, the CMef, BMS, advised the BCNB that he had considered plaintiff’s rebuttal but adhered to his previous recommendation.
19. On October 21,1965, the BCNB, based on an extensive examiner’s report, denied, without a hearing, plaintiff’s application for correction of his naval record.
20. (a) The issue in this case is whether the decision of the B CNB that plaintiff was 20 percent disabled at the time he was removed from the NTDBL is arbitrary, capricious, and not supported by substantial evidence.
(b) The VA Schedule for Bating Disabilities under Diagnostic Code 5293 is as follows:
* * * Intervertebral disc syndrome Rating
Pronounced; with, persistent sciatic neuritis with characteristic pain and demonstrable muscle spasm, absent tendo achillis reflex, or other nerve pathology appropriate to site of diseased disc, little intermittent relief_ 60
Severe; recurring attacks, with intermittent relief_ 40
Moderate; recurring attacks_ 20
Mild_ 10
Postoperative, cured_ 0
*289 There is no written definition of the terms “pronounced,” “severe,” “moderate,” or “mild,” as such terms apply to Code 5293.
21. (a) At the trial in this court, plaintiff’s medical expert witness was Dr. Marvin C. Korengold, a Washington, D.C. physician, who, since 1955 has been in the private practice of neurology; is an experienced medical school instructor in neurology; is a consultant to the VA in that field; and is familiar with the VA Eating Schedule.
(b) Based on a physical examination of plaintiff on November 15, 1966, and a review of plaintiff’s medical records, Dr. Korengold was of the opinion that plaintiff’s condition in 1961, at the time he was separated from the naval service, was “severe” within the meaning of VA Diagnostic Code 5293 and should have been ratable at 40 percent disability. In his opinion, the terms “moderate” and “severe,” as used in Code 5293, are as follows:
The person who is classified as moderate, is a person who has a history of back injury, with recurring attacks. Now these attacks may occur usually with irregularity, they may occur over a period of once a year, maybe twice a year, maybe once every two or three years. It is usually an individual who does not have to wear a back support, a back brace. It is an individual who usually loses only a few days time a year from his job because of his disability, who may also have these little findings on examination, a reflex change, a patch of numbness. He may have other findings at a particular time, but the condition is considered moderate. He is aware of his disability, from time to time, and he may guard against those kinds of activities that are more apt to cause him trouble.
The person who has a severe disability is a person who has a history of injury or trauma, with back discomfort radiating into the extremities. It is intermittent. During the period of time in which he feels well, he may be asymptomatic, he might very well pass a physical examination or neurological or orthopedic examination with hardly a residual at all, possibly nothing, but yet, the very next day or an hour after the examination, he may bend down to tie his shoe lace and be flat on his back for a week.
22. (a) Comdr. Harold E. Noer, Medical Corps, U.S. Navy, testified as a witness for defendant. Dr. Noer is certified *290 by the American Board of Orthopaedic Surgery and, at the time he testified, was associated in orthopaedics with the Armed Forces Institute of Pathology and the National Naval Medical Center, Bethesda, Maryland. He has sat on numerous medical boards, many involving herniated discs. He has never sat with a Physical Evaluation Board, is unfamiliar with the YA schedule for rating disabilities, and is unable to distinguish between “severe” and “moderate,” as those terms are used in the YA Diagnostic Code 5293.
(b)Dr. Noer testified that he had examined all of plaintiff’s medical records and that it was his opinion plaintiff was fit for duty in 1961.
23. (a) Comdr. Stephen J. Barcay, Jr., Medical Corps, U.S. Navy, testified as a witness for defendant. Dr. Barcay’s specialty is Internal Medicine. He is not trained in neurosurgery, is not an orthopedist, and has had six months’ training in neurology. At the time of trial, he was serving as a permanent medical member of the PEC as representative of the Surgeon General of the Navy. He was not a member of or assigned to the PEC prior to 1966 and had never examined plaintiff’s medical records prior to the filing of this suit.
(b) Dr. Barcay testified that he has considered and rated Navy personnel under YA Diagnostic Code 5293 and that he reviews the records of about 25 herniated disc cases a week.
(c) Dr. Barcay testified, based on examination of plaintiff’s records, that he would have rated plaintiff fit for duty in 1961.
(d) Based on medical records considered by the YA, Dr. Barcay agreed with the VA’s assignment of 10 percent disability in 1957 and 20 percent in 1963. He considered the rating in 1965 of 40 percent as “on the borderline.” (See finding 17(e).)
(e) Dr. Barcay testified with respect to definitions of “severe” and “moderate” ratings under YA Diagnostic Code 5293 as follows:
The severe category is one where the patient has a good deal of time symptomatic, that is, his attacks take up a good deal of his life, and he is often more times symptomatic than in remission, and requires frequent hospitalization or confinement, whether that be at home or in a hospital, under a physician’s supervision.
*291 This can be self-imposed confinement, because of an attack, or it can be directed confinement in the hospital by the physician.
The moderate category is almost the converse, in that the patient has more tune in remission than he does when he is symptomatic, and usually, these attacks are less severe, although any individual attack may be more severe than any other.
In other words, what I am saying is that any one given attack of intervertebral disc symptoms may be disabling for a period of time, but that individual attack is not the thing upon which we base our rating decision. It is the overall picture and how much time is lost in comparison to how much time is retained, so to speak, in a useful fashion.
I might state here that when we talk about an attack, we do not necessarily mean that a man goes from no symptoms at all to fiat on his back in bed. A man may have a constant back ache, a nagging low back ache, but be able to exist with it, work with it, or even perform duty with it, if he is on active service. This is considered the base line. The attack is how much above that point he gets to prevent him from performing his duties or doing his work, or living his normal existence.
CONCLUSION OF Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and his petition is therefore dismissed.

 63 Stat. 816-17, 37 U.S.C. § 272(a) (1952), subsequently amended, 10 U.S.C. § 1202 (1958).

 63 Stat. 819, 37 U.S.C. § 272(e) (1952), subsequently amended, 10 U.S.C. § 1210(a) (1958).

 At the time, plaintiff was employed by the U.S. Department of State in France.

 The trial was conducted by Commissioner Paul H. McMurray, now retired.

 In capsule form, plaintiff's disability ratings from 1956 to 1962 were as follows:
Year Board or Agency Percent
1956 PEB. 40
1957 VA rating.... 10
1961 PEB... 20
1961 PRO (3-way vote).. Pit, 20,40
1961 NPDRB: hearing #1... 10 (3 votes), 20 (2 votes)
hearing .. 20 (5 votes)
1962 VA rating. 20

 To be placed on the NTURL In 1956, plaintiff’s disability rating had to be at least 30 percent. (See n. 1.) Under VA Code 5293, this meant his condition must be rated “severe” rather than “moderate." The whole tenor of plaintiff’s argument here assumes the “severe,” 40 percent rating in 1961 was correct, and all subsequent ratings less than 40 percent were arbitrary and capricious, despite the fact that they were based on considerable additional medical evidence and, at times, the testimony of plaintiff and argument of counsel before lower boards.
However, considering the record as a whole, and mindful that the severity and permanency of herniated discs is difficult to diagnose, it is just as reasonable to infer that the PEB in 1956 may have had doubts about rating plaintiff 40 percent disabled, but resolved any doubt in plaintiff’s favor so that he could be put on the NTDRL for further observation, particularly in view of the history of poor response of plaintiff’s condition to treatment while on active duty.

 This is consistent with the Statement of General Policy of the VA Code, as noted in Cooper v. United States, 178 Ct. Cl. 277, 294 (1967):
* * * Generally, * * * the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerba-tions ♦ *»,*** the emphasis at all times [is] upon the limitation of activity imposed by the disabling condition. * * * [Emphasis supplied.] * * * Each disability must be viewed from the point of view of the veteran working, or seeking work.