**Philip B. THOMPSON**

v.

**The UNITED STATES.**

**No. 315–63.**

United States Court of Claims.

Jan. 24, 1969.

---

J. Kenton Chapman, Washington, D. C., attorney of record, for plaintiff.

Edgar H. Twine, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on April 26, 1967. Exceptions to the Commissioner's opinion, findings and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion, findings and recommended conclusion of law of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and his petition is dismissed.

## OPINION OF COMMISSIONER

BERNHARDT, Commissioner:

This is a suit for recovery of disability retirement pay based upon the contention that, at the time of plaintiff's release from active duty as an Army Air Force pilot in 1947, he was permanently incapacitated for military duty by reason of mental illness. The immediate issue is that the action of the Air Force Board for Correction of Military Records in denying his application for correction of his record to reflect his incapacity was arbitrary, capricious, and not supported by substantial evidence. After a full review of the record and upon consideration of the legal authorities cited by the parties and their respective requested findings of fact and briefs, it is my opinion based upon the following detailed and ultimate findings of fact and recommended conclusion of law that plaintiff is not entitled to recover and his petition should be dismissed. See, e. g., Boland v. United States, 169 Ct.Cl. 145, 148 (1965); Towell v. United States, 150 Ct.Cl. 422, 433 (1960).

### FINDINGS OF FACT

1. On July 18, 1941, plaintiff, a resident of California, was given a physical examination for flying and was found to be physically qualified for flying duty in the Army. At that time it was recorded as to his nervous system: "Reflexes, gait, coordination, musculature, tension, tremor, and other pertinent tests—reflexes active and equal, no tremor, fair relaxation." It was also reported as to his estimated adaptability for military aeronautics: "Satisfactory F.A.R. 174. Very alert, ready, grasps quickly, strong motive, purposeful, athletic, self reliant, aggressive, fairly frank, superior material."

2. On November 4, 1941, plaintiff was appointed Aviation Cadet. After flight training he was commissioned a Second Lieutenant pilot on May 21, 1942. He was promoted to First Lieutenant on January 29, 1943, temporary Captain on November 15, 1946, and was honorably discharged as Captain from active service in the Army on January 13, 1947.

3. From May 1942 to December 1943 plaintiff was stationed for training or for flying duty at various stations within the United States. On July 10, 1943, while he was on duty in the United

States, plaintiff was given disciplinary punishment (reprimand and $83.33 pay forfeiture) for being absent without leave for five days.

4. Plaintiff was transferred to England in December 1943 and was assigned as a bomber pilot to the 448th Bombardment Group. After flying 30 combat missions—the normal tour of duty—he was rotated back to the United States in October 1944. In July 1944 he was awarded the Distinguished Flying Cross, the Air Medal, and three oak leaf clusters.

5. From his entry on active duty until completion of his tour of duty in England plaintiff's performance ratings were all "excellent" for the periods he was rated, except for the period from April 14 to May 28, 1944, when his performance rating was "unsatisfactory". Following his return to the United States, until his release in January 1947, his performance ratings were all "excellent" or "very satisfactory" for the periods when he was rated.

6. From April 14, 1944 to May 28, 1944, plaintiff was transferred to a different squadron in the 448th Bomb Group, and completed six missions while serving under Major G. L. Stringfellow. Major Stringfellow gave plaintiff a performance rating of "unsatisfactory" during that period. This rating, to which plaintiff took exception, was subsequently determined by higher authority to have been due to a "personality conflict" between plaintiff and Major Stringfellow. Plaintiff showed a marked improvement after his transfer from Major Stringfellow's squadron. Plaintiff received no promotions in rank during his tour of duty in England and attributes this to the unsatisfactory rating given by Major Stringfellow. Plaintiff was considered one of the better bomber pilots.

7. After plaintiff returned to the United States he was stationed at air bases in Santa Ana, California (until January 1945), and in Fort Worth, Texas (until May 1945), all but a few days of which period he was awaiting an assignment to duty. The conditions at these bases were very fluid and at times plaintiff was in pools of officers with no supervision for extended periods. Plaintiff professed to enjoy combat flying and wanted to return to it, for he considered himself temperamentally attuned to combat flying rather than the situation existing for. him in the United States upon his return from overseas. After the defeat of Japan in August 1945 most soldiers in the ZI had no specific assignments and were marking time for release from active duty. These conditions of idleness set the stage for disciplinary problems.

8. *Disciplinary Problems*—From June 30 to August 28, 1945, plaintiff served as an instructor in training at Liberal Army Air Field, Liberal, Kansas. On October 26, 1945, plaintiff was punished under Article of War 104 for failure to report for flying duty on August 5, 1945, and failing to report at the proper time for duty at the Refresher Training Section from August 6 to August 19, 1945, and was restricted to the post for seven days.

9. On April 5, 1946, punishment under Article of War 104 was imposed on plaintiff at Long Beach Army Air Field for failing to report for roll call in his flight drills and physical training formations for the period from March 5 to March 18, 1946. The punishment imposed was a written reprimand and a forfeiture of $25 of his pay.

10. On July 19, 1946, punishment under Article of War 104 was imposed on plaintiff at Long Beach Army Air Field for failing to meet roll call for five days in May and June 1946. He was reprimanded and forfeited $80 of his pay. He narrowly escaped a General Court-Martial. A stern letter from the Commanding General, after citing plaintiff's previous misconduct, stated in part:

* * * Such a record reflects discredit upon your personal character and indicates you are unworthy of the uniform you wear. It is the duty of all military personnel to repair at the fixed time to the properly appointed

place, and it is the duty of any officer to conduct himself so as to be an example of decorum to be followed by his associates in the service. In both of these you have failed miserably. * * *.

11. On July 16, 1946, plaintiff's commanding officer, Lieutenant Colonel Maurice S. Dillingham recommended that plaintiff be discharged pursuant to reclassification board action because of habits or traits of character affecting his efficiency as an officer. The habits and traits referred to were plaintiff's various AWOL offenses to which reference has been made above and the following additional incidents:

* * * On *4 July 1946*, Lt. Thompson was assigned as Mess Count Officer at the Enlisted Men's Mess but he failed to report to accomplish this duty. On *8 July 1946* subject officer was absent from his assigned duties for the entire day. On *11 July 1946* he was called to the Legal Office at approximately 1030 and he failed to report back to this section or his ground school duties for the remainder of the day. On *12 July 1946* subject officer was absent from all his duties from 0800 to 1500.

Action on the recommendation for reclassification board action was never concluded.

### Medical History in Service

12. On March 26 and 27, 1945, plaintiff was given routine care and infared treatment at Fort Worth Army Air Field for a complaint of "severe pain and tenderness in left sacroiliac region". He was discharged and returned to duty March 28, 1945.

13. On August 20, 1945, plaintiff was admitted to the Station Hospital at Liberal Army Air Field with complaints of nervousness, irritability, insomnia, anorexia (lack of appetite), lack of initiative, and loss of weight within the preceding four months. The report of that hospitalization contains the following entries:

### HISTORY OF THE PRESENT ILLNESS

\* \* \* \* \* \*

Patient states that he was in ETO 14 mo. and flew 30 missions and had several severe "scares". He states he has been in grade 38 mo. and when he returned from over seas he was assigned to Ft. Worth to be a B–24 instructor, but he had considerable trouble adjusting himself to be an instructor due to above symptoms and the fact that many of his classmates held a much higher rank than he did. Patient has had to have barbiturates in order to sleep for the past 2½ mo. He has resorted to moderate drinking in the past few mo. He never used alcohol before going over seas. He states that he has several night mares every night. Patient went AWOL from Aug. 8th to 15th and was confined to his barracks. He was in such a state of emotion that he might have gotten into serious trouble.

\* \* \* \* \* \*

### PHYSICAL EXAMINATION

\* \* \* \* \* \*

Nervous system:

All normal reflexes present

No abnormal reflexes

\* \* \* \* \* \*

### INITIAL SUMMARY, WORKING DIAGNOSIS, CONTEMPLATED LABORATORY TESTS, AND CONSULTATIONS

\* \* \* \* \* \*

Initial summary:

Patient admitted to hospital with signs and symptoms of post combat fatigue.

Working diagnosis or impression:

1. Post combat fatigue

### PROGRESS NOTES

\* \* \* \* \* \*

August 20, 1945 patient admitted to hospital with history of marked nervousness, and irritability based on wanting to get out of Army. F.W.K.

August 22, 1945 patient was AWOL from August 8 to Aug. 15, 1945. He was confined to quarters and he reported to Flight Surgeon's office to procure some sleeping pills. After interviewing this officer it was noted that he was suffering from post combat fatigue and he was in such a state of mind that he was hospitalized. F.W.K.

8-23-45 pt rested well last night, no complaints * * *

8-24-45 pt rested poorly last night, no other complaints * * *

8-25-45 pt rested pretty well last night. Feels well.

14. On August 28, 1945, plaintiff was transferred from the Station Hospital at Liberal Army Air Field to the Regional Hospital in Amarillo, Texas for "observation for physical fitness". The initial working diagnois of combat fatigue which was made at the Station Hospital was, as is true of all working diagnoses, merely a shorthand statement of the doctor's initial impression of plaintiff's condition. Thereafter, test and diagnostic procedures were made in order to arrive at a final diagnosis.

15. Plaintiff was hospitalized at the Regional Hospital until September 11, 1945 when he was returned to duty with a diagnosis of "no disease found". The hospital records compiled on plaintiff during his hospitalization at the Regional Hospital reveal the following:

(a) Plaintiff's chief complaint at the time of his admission as reported in his hospital records was: "Disgruntled by 38 mos. in grade as a 1st. Lt.—felt he would soon do physical violence to Lt. Col. (C.O.) and thus admitted himself to hospital."

(b) In the "History of the Present Illness" section of plaintiff's hospital report the following notation is set forth:

Onset—Flew 30 missions in ETO as 1st Lt., returned to this country and made an instructor much to aversion of pt.—resented being taught how to fly again—requested discharge or another overseas tour but turned down—

In office of Lt. Col. at Liberal, pt. felt surge of violence to grasp Lt. Col. by throat. So pt. went to flt. Sur. [flight surgeon] and claimed unless something were done he would do violence to Lt. Col.

Pt. hostile toward certain officers exercising arbitrary authority—he refers to them as "jokers".

Pt. was AWOL for 7 days in order to see about a skating contract in Hollywood.

(c) The impression of the examining doctors, Dr. Kelly and the psychologist, Lieutenant King, as set forth in the "History" section of plaintiff's hospital record was as follows:

*Impression*—aggressive, assertive personality with little evidence of psychopathology. Some manic tendencies.

(d) The "initial summary" and "working diagnosis" of plaintiff's condition were as follows:

Initial summary:

An energetic aggressive individual * * * about 4 mo ago when he lost enthusiasm for his work—He became irritable and restless. Insomnia present Loss of appetite—He declares that he is improved.

Working diagnosis or impression:

No disease found.

(e) The report of the examination of plaintiff's nervous system which was made during his hospitalization showed: "Cranial nerves intact, Coordination normal, Reflexes normal, No sensory changes."

(f) In his report of an examination made of plaintiff on September 1, 1945, Lieutenant King stated in pertinent part as follows:

*Psychological*

1 Sep 45 Rorschach Test Protocol—
* * * * * *

Impression—Test characteristics of an aggressive & assertive psychopath with emotional instability. * * *

1 Sep. 45. Interview. Evidence of some tendencies for nomadism and

escape from responsibility. Attended various colleges for 6 yrs but never obtained a degree, left home at age 16 to see the world (strong drive for new experiences) and gravitation toward Hollywood cultural milieu. Not actively anti-social but seeks social environment where personality traits are acceptable.

No evidence of psychopathic sexuality. Somewhat emotionally involved in most of his behavior-manic tendencies.

Impression—assertive psychopathic traits expressed in socially acceptable environment. Lack of parental affection & familial coldness stunted his emotional growth & feelings of emotional security. No serious psychopathy.

(g) The following notations in plaintiff's hospital record were made by Dr. Kelley on September 6–8, 1945:

6. Sept. He declares that he lost enthusiasm for his work, initiative about 4 mo. ago while in Ft. Worth, Texas. He thinks his trouble was due to not having much to do and lack of promotion. He feels more composed now. He is able to relax & to sleep. His appetite is improved. He is also disgruntled about not being able to accept a contract to skate with Sonja Henie this winter.

\* \* \* \* \* \*

8 Sept.—No unusual behavior noted —he is to be discharged to duty 11 Sept 1945—Diag [diagnosis]—No disease found—LD yes.

(h) In his final summary prepared on September 8, 1945, Dr. Kelley stated:

Chief complaint: Disgruntled by 38 mos. in grade as 1st Lt. Dissatisfied with his assignments in past 4 mo— Loss of interest in war effort. Desire to be discharged to civilian life— Onset & Symptoms: Hypermanic type Personality—Loss of drive & aggressive tendencies in past 4 mo. with repressed hostility towards the Army— Physical Exam: Essentiality neg— Hosp. course—no unusual behavior— Lab & X Rays: Routine urinalysis &

blood count normal—Diag—No Disease found—LD yes—Disp—To duty—8 Sept 1945.

(i) The notes made by the nurses during the 14 days that plaintiff was hospitalized showed no unusual behavior.

(j) In a letter dated September 10, 1945, from the Chief of the Psychiatric Service at the Regional Hospital in Amarillo, Texas, to the Surgeon at the Station Hospital in Liberal, Kansas, it was stated:

1. 1st Lt. Philip B. Thompson, 0 725 377, Squadron B, Liberal Army Air Field, Liberal, Kansas, was transferred to this hospital on 28 August 1945 for observation for physical fitness. He is to be returned to duty on 11 September 1945.

2. The Officer has an aggressive personality with considerable drive to excel. He has been frustrated in the army and resents the failure of recognition of his abilities through promotion. He also complains about the inactivity of his assignments recently.

3. Diagnosis: No disease found.

4. Recommendations: Return to duty.

16. An "aggressive assertive psychopath with emotional instability", the description used by Dr. Kelley and Lieutenant King in describing plaintiff (see finding 15(f), supra), is not a description of a person with a mental illness; it is a description of a personality or a character, as in a less complex form timidity or egoism are personality or character traits. Post-combat fatigue is an acute condition which usually disappears after the individual has been removed from the stress of combat.

17. A prewar male friend of plaintiff's with whom plaintiff visited occasionally in 1945 after his return to the United States, and with whom plaintiff lived for ten months in 1946, testified that plaintiff often mumbled in his sleep as if he were having dreams about being in combat, that he was unpredictable in his habits (without defining), was nervous and excitable, moody, and drank

more heavily than before his service overseas. While this witness also testified that he observed the plaintiff having frequent nightmares, obviously this was a subjective conclusion of the witness. The witness also testified to an incident occurring in 1945 or 1946 when, while riding in an automobile with plaintiff and two women, the plaintiff had the car stopped, and jumped out of the car cowering under a blanket, whimpering in terrified tones that "The Messerschmitts, they are after me."

18. On November 13, 1946, plaintiff was given a terminal physical examination and was found not to be incapacitated for either general or limited service. In the "medical history" section of this report it is stated "Headaches, 1944, still present occasionally * * *."

19. On November 14, 1946, plaintiff was placed on terminal leave until January 13, 1947, when he was released from active duty by reason of demobilization. After plaintiff's release from active duty, he remained in the Reserves until April 18, 1957, when he was honorably discharged therefrom pursuant to the recommendation of a Board of Inquiry.

*Medical History After Release*

20. On December 26, 1946, plaintiff filed an application with the Veterans Administration for disability compensation, describing his complaints resulting from military service as arthritis in hips, right knee and hands, headaches for preceding two years, eye aches and cataracts, since June 1945. On March 21, 1947, the Veterans Administration rated plaintiff 0 percent for pterygium (eye disease), and did not find either arthritis or cataracts.

21. On August 8, 1949, plaintiff was given an examination for active duty in the Officers Reserve Corps and was found physically qualified. In the report of that examination, plaintiff stated on a checklist that he had never had: "frequent or severe headaches", "dizziness or fainting spells", "frequent trouble sleeping or sleep walking", "frequent or terrifying nightmares", or "nervous trouble of any sort". Plaintiff also stated that he did not have "any physical or mental complaints at present". Plaintiff signed a certification which stated that the information supplied by him was true and complete to the best of his knowledge. In his testimony at the trial of this case, plaintiff admitted that he had read this certification prior to signing it.

22. On April 6, 1951, October 3, 1951, and January 5, 1955, plaintiff was examined by the Veterans Administration for complaints about pains in his lower back and legs, certifying in each instance that he had given a complete and correct statement of his complaints. In 1951 the Veterans Administration awarded plaintiff a 10 percent disability rating for lumbosacral strain. That is the only rating awarded plaintiff by the Veterans Administration up to the time of trial of this case in May 1966.

23. In 1952, plaintiff was in an automobile accident. On March 2, 1956, a clinical impression of "Psychoneurotic Reaction" was entered in connection with plaintiff's examination as an outpatient at the Veterans Administration Clinic in Los Angeles, and an EEG interpretation of "Mild Cerebral Dysrhythmia" was concluded. On May 29, 1956, plaintiff was admitted to the Veterans Administration Hospital in Los Angeles for a study of seizures and he was hospitalized until July 9, 1956. In the discharge summary prepared by the resident in neurology at the conclusion of plaintiff's 41-day period of hospitalization it was stated:

The patient states that he was in good health prior to 1952, at which time he was involved in an automobile accident, immediately following which he was unconscious for a few seconds then decreasingly confused for the next 2 days. He sustained a left periorbital hematoma and a separation of the sternum. Three weeks after the accident he began complaining of pain about the right elbow. Light pressure on the neck would make this pain shoot to his hand. This pain was

intermittent and increased in severity until April 1953 when he began to have deep-seated pain in the chest, which radiated up to the base of the neck and into his head. This pain lasted from 3 to 5 seconds and was associated with a dazed condition * * * which he was aware of his surroundings, heard people talk, but did or did not respond to questioning. The pain in his arm had become more severe, extending from his right shoulder down the arm into the thumb and the first 2 fingers. These symptoms went undiagnosed until January 1956 a herniated cervical disk (5 and 6), was diagnosed, followed by surgical removal. Complete relief of this arm pain followed one month after surgery, but the "seizures" which he describes as having been present since 1953, continued. These are ushered in by dizziness, in which objects move in the environment for 10 or 15 seconds, then a period of total blackout, lasting 3 or 4 minutes, during which he performs normal actions for which he has no memory later. These attacks have occurred at any time, but have been more frequent at night, when they have occurred as closely as every 10 minutes. * * * The patient, in describing his attacks further, states that a typical attack is usually preceded by brief anxiety, followed by a period during which he carries out routine activity occasionally travelling somewhere, but for which he has no recall. He feels shaky for a few minutes after these attacks. * *

This patient has had no seizures since being in the hospital. He has received 1 dilantin capsule t. i. d. and 250 mgs. diamox in the a. m. Workup has been negative for evidence of central nervous system tumor. His symptoms suggest temporal lobe seizures, but are not altogether typical. It is felt that a strong functional overlay is present. * * *.

DIAGNOSES: 1. 930–x0x Psychomotor attacks.

At the trial of this case in May 1966 plaintiff reviewed the discharge summary and stated that it was an accurate statement of what he had told the neurological resident.

24. On January 20, 1958, plaintiff was admitted to Montreal Neurological Institute for examination. He was discharged on February 1, 1958. The history as given by plaintiff at the time of that hospitalization and the discharge diagnosis contained in the report of that hospitalization are as follows:

SUMMARY OF POSITIVE FINDINGS:
History:

1. Cephalic sensation with right sided headache nearly constant since 1952.

2. Feelings of unreality and possible automatisms since 1954.

3. Difficulty in thinking and loss of initiative, progressive, since 1954.

4. Numerous complaints of varied somatic pains since 1945.

5. Diplopia on right gaze since 1954.

6. Loss of libido 2 years.

DISCHARGE DIAGNOSIS:

Cerebral seizure suspect.

The psychiatric consultant at the Montreal Neurological Institute reported as follows:

Psychiatry Jan. 24/58: On the basis of these interviews, I would be inclined to think that one is dealing with 2 conditions. There is apparently a neurotic maladjustment to his present situation, particularly as far as steady work is concerned. In addition, the patient describes attacks which seem to be characterized by headache, distortion of visual perception, confusion of meaning.

25. In 1958 plaintiff filed a claim with the Veterans Administration seeking a determination that he had service-connected epilepsy. In a rating action taken on October 16, 1958, the Veterans Administration denied plaintiff's claim of service-connection for psychomotor attacks. On April 15, 1959, the Board of Veterans Appeals of the Veterans Administration considered the question of whether plaintiff was suffering from

service-connected psychomotor epilepsy and concluded that a determination of service-connection was not in order. In its decision, the Board stated in pertinent part as follows:

The service medical records do not show manifestations of psychomotor attacks during service and it is not otherwise contended, the claim for service connection thereof being based on the contention, in effect, that they are related to irritability demonstrated in service. While such complaints were registered in service, together with other signs and symptoms, the complaints were found to be manifestations of an aggressive personality. Such personality traits are not evidence of disease or injury within the meaning of governing laws and regulations. No neuropsychiatric disease was diagnosed at that time, thereafter, during service or on examination preliminary to separation from service. He is not shown to have sought or required treatment for a neuropsychiatric disease for a number of years after separation from service.

In the "Outline of Material Evidence" section of the Veterans Administration report of April 15, 1959, it is stated that "the evidence shows he [the plaintiff] was treated for several days in July 1944 for flying fatigue". This observation may have been based upon plaintiff's statement to the examiner making out the report, for there are no medical records showing any hospitalization or treatment for flying fatigue in 1944. Nor in any previous applications for disability compensation or hospitalizations did plaintiff refer to such treatment in 1944.

26. By application dated October 27, 1961, to the Veterans Administration, plaintiff forwarded a report of a psychiatric examination of June 20, 1961, by Dr. J. E. McGinnis, and stated that he was seeking disability compensation on the basis of a condition which he was no longer calling epilepsy but was now calling a war psychosis. In his report, Dr. McGinnis concluded that plaintiff did not have psychomotor epilepsy but that he did have a mental illness which was either traumatic neurosis of war (most likely), or paranoid state, or schizophrenic reaction, residual type (with an initial schizophrenic reaction, paranoid type), which had its onset in 1944. By letter dated November 17, 1961, the Regional Office of the Veterans Administration advised plaintiff that the evidence submitted by him had been carefully reviewed but it did not warrant any change by the Veterans Administration in its previous determination.

27. In an application dated November 22, 1961, plaintiff appealed the Regional Office's determination to the Administrator of the Veterans Administration. In his application he stated in part that: "It is my contention that 'Post Combat Fatigue' should be adjudicated as a Service Connected condition." The Board of Veterans Appeals denied plaintiff's appeal in a decision of June 1, 1962, which stated, in pertinent part, as follows:

This Board does not disagree with the opinion offered by Dr. McGinnis, namely, that the veteran does not have psychomotor seizures. However, it is unable to concur in his neuropsychiatric classification of "war neurosis" or with the opinion that it had its inception in service, precipitated by emotional disturbance at that time. It is noted that the opinion was based on the veteran's history, which is not substantiated by the evidence of record and which was first disclosed in detail on that examination. It is not to be inferred from this statement that the veteran's veracity is being questioned. On the contrary, due credence is given thereto but an intelligent judgment of the issue requires that it be evaluated as a part of the entire evidentiary record. Viewed in that light, it is the opinion of this Board, that the evidence does not demonstrate the presence of an acquired neuropsychiatric disease but more precisely reflects a character disorder, for which service connection may not be granted

under the applicable regulations. (38 C.F.R. 3.30(C))

The Board has also considered the incident in service when the veteran was treated for flying fatigue and his complaints when he was later under observation. The applicable regulations authorize service connection for a chronic disease, but service connection may not be properly allowed for acute, transitory reactions. To establish chronic disease in service, chronicity and the disease entity must be established by adequate observation and study at that time. Otherwise, evidence of continuity is necessary to support the claim. In this connection, the Board may not ignore the findings of "no disease" on observation in service and the absence of evidence of the presence of a chronic neuropsychiatric disease for a considerable period of time after separation from service.

\*  \*  \*  \*  \*  \*

1. A psychiatric disability, irrespective of its diagnostic classification, was not incurred in or aggravated by service.

2. Error, obvious or otherwise, in the prior appellate decisions in which service connection was denied for psychomotor seizures, has not been established; the evidence thereafter submitted does not warrant revision or modification of those decisions.

## DECISION

Service connection is not warranted for post combat fatigue (war neurosis or traumatic neurosis) or other psychiatric disease.

### Correction Board Proceedings

28. On September 9, 1957, plaintiff applied to the Air Force Board for Correction of Military Records requesting that his records be corrected to show that at the time of his release from active duty he was permanently unfit for active duty because of a herniated lumbar disc and cerebral seizures. Plaintiff's application, accompanying documents and his military medical records were reviewed by the Office of the Surgeon General of the Air Force and in a memorandum dated January 24, 1958, from the Chief of the Physical Standards Division of that office, it was concluded: "It is the opinion of the Surgeon General that there is no basis for a conclusion that the applicant was physically incapacitated by his military service, and no alteration of the record is recommended." The Surgeon General stated in this communication that examiners disagreed about the actual presence of a herniated disc condition, and that "A strong psychogenic component was suspected in connection with the back symptoms." Plaintiff's application was denied by the Correction Board on June 6, 1958 and the denial was reaffirmed on July 8, 1958. Although after first notification of the rejection of his application the plaintiff complained that he had not been notified in advance of the hearing so that he could attend, the plaintiff's application does not contain a request for a hearing.

29. On September 15, 1958, plaintiff reapplied to the Correction Board and requested that his records be corrected to show that at the time of his release from active duty he was retired for disability resulting from psychomotor seizures. This application was denied on February 17, 1959, without a hearing, although one had been requested.

30. On March 30, 1960, plaintiff submitted another application for correction of his military record, indicating again that he desired to appear before the Board in Washington, D. C., and attaching the affidavit of Attorney August Felando and medical report of Dr. Edward Politoske. On September 21, 1960, plaintiff was notified that his application was denied, without a hearing.

31. On November 18, 1960, plaintiff again submitted another application to the Correction Board, indicating his desire to appear before the Board in Washington, D. C. Plaintiff attached further exhibits, including copies of medical reports of his hospitalizations in 1945 at Liberal, Kansas, and Amarillo,

Texas. On March 7, 1961, the Correction Board denied plaintiff's application, without a hearing.

32. On October 20, 1961, plaintiff applied again to the Correction Board for correction of his military record. Plaintiff again indicated that he would appear before the Board in Washington, D. C., and with this application attached the medical report of Dr. James McGinnis. On January 29, 1962, the Correction Board notified plaintiff that his application was denied, without a hearing.

33. Plaintiff's various applications to the Correction Board were accompanied by lengthy statements which included extensive quotations from medical reference books. Those excerpts were compiled by plaintiff who has done extensive reading in the field of medicine since his release from active duty.

### Post-Service Employment

34. Following discharge from active service and his marriage in the latter part of 1946, plaintiff lived on savings and the equivalent of unemployment compensation through 1947 when he became an investigator for the County of Los Angeles, this position being held until 1948 or 1949. In 1949 or 1950 plaintiff was arrested on a charge of attempted extortion, pleaded guilty and served 60 days in county jail and paid a fine of $1,000. Plaintiff then became interested in a foreign trade company for the importation of German machinery, in which plaintiff was engaged for approximately two and a half years, the business closing about 1954. Plaintiff was employed by Clary Corporation for approximately six months in 1955 and other than a short period of activity as a real estate agent, plaintiff having a real estate agent's license, plaintiff has been unemployed from 1956 approximately to the present time.

### Expert Testimony

35. At the trial plaintiff offered the testimony of Dr. James Edward McGinnis, a specialist in psychiatry, since 1945 a member of the faculty in the Department of Psychiatry at the University of Southern California School of Medicine. Dr. McGinnis testified that he saw plaintiff on five occasions in April and in May 1961, that he submitted a 25-page psychiatric examination report dated June 21, 1961, in connection with that study, with some seven hours devoted to examination of plaintiff in these five different sessions and examined some 14 groups of documents listed at the conclusion of his June 21, 1961, report. Dr. McGinnis testified that since 1961 plaintiff has stopped in at his office for brief consultations. On April 26, 1966, and on May 2 and May 3, 1966, Dr. McGinnis examined plaintiff. In March of 1963 Dr. McGinnis consulted with plaintiff's wife with regard to plaintiff's condition. Confirming the conclusion in his report dated June 21, 1961, Dr. McGinnis stated:

> I came to the conclusion that he (plaintiff) had become emotionally ill during the course of his armed forces service, and that the probable date of the beginning of that illness was in the middle part of 1944.

Repeating this conclusion later on in his testimony, Dr. McGinnis stated that additionally he had the conviction that plaintiff was without question emotionally ill and to a degree that would have been obvious had plaintiff been subjected to psychiatric study, this as of the time that he was separated from active service in the early part of 1947; and that plaintiff's subsequent course has clearly shown that he has been incapacitated not only for military life, but incapacitated and gravely adversely affected by his emotional disorder to the present time. Dr. McGinnis' 25-page report of 1961 was submitted to the Veterans Administration in 1961 in connection with plaintiff's application for disability compensation pay (finding 26, supra), and also to the Correction Board in connection with plaintiff's last application (finding 32, supra). The report corresponded to Dr. McGinnis' testimony at trial.

36. Dr. Eggertsen, a Board certified psychiatrist who is a Colonel in the Air Force and the Chief of Psychiatry at Travis Air Force Base Hospital, testified for defendant. Dr. Eggertsen is the foremost psychiatrist in the Air Force. While serving in the Air Force in Washington he was a consultant in psychiatry to the Surgeon General of the Air Force and was a Visiting Professor of Psychiatry at Georgetown University. During his career in the Air Force, he has served as a witness before Physical Evaluation Boards and has served on hundreds of Medical Boards, which are boards composed of three medical officers who meet to decide whether a person is fit or unfit for service.

37. Dr. Eggertsen was present throughout the entire trial, and, thus, heard the testimony of plaintiff and Dr. McGinnis. He had not examined the plaintiff professionally. Prior to testifying, he reviewed all of the various medical reports pertaining to plaintiff that are in evidence in this case which include all the medical records compiled while plaintiff was on active duty and medical reports such as Dr. McGinnis' report and the Veterans Administration's reports made after his release from active duty. On the basis of the testimony he heard at the trial, his examination of the documents in evidence, his observation of plaintiff while he testified and his medical training and experience, it was Dr. Eggertsen's opinion that plaintiff was not suffering from a mental illness at the time of his release from military service nor at any other time up to and including the time of trial in May 1966.

38. From the testimony he heard and the documents he reviewed Dr. Eggertsen was in accord with Lieutenant King's and Dr. Kelley's descriptions of plaintiff's personality and character (finding 15, supra), except that he explained that the descriptive term "psychopath" has now been replaced by the term "sociopath" and, thus, the proper description of plaintiff's personality in present day terminology, in Dr. Eggertsen's opinion, would be a sociopathic personality with emotional instability of a mild degree which is not a mental illness but a description of character. A person with this type of personality is aggressive, alert, active and has ready access to his motor capabilities.

 39. Character and behavior defects are not considered as a diagnosis of a medical or psychiatric condition *per se* and are not a basis for disability retirement.

### *Ultimate Finding*

40. The denial of plaintiff's various applications by the Air Force Board for Correction of Military Records is supported by substantial evidence and was neither arbitrary nor capricious.

### CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.